THE CINCINNATI ENQUIRER, INC., APPELLANT, *v.* AMERICAN SECURITY & TRUST CO., APPELLEE.*

*Motion to certify the record overruled, April 15, 1959.

(No. 8382—Decided December 8, 1958.)

*Messrs. Frost & Jacobs* and *Mr. Francis L. Dale,* for appellant.
*Messrs. Graydon, Head & Ritchey,* for appellee.

MATTHEWS, J.   This case comes before this court at this time for final disposition on appeal on questions of law from a judgment declaring the rights of the parties under a certain contract, whereby the defendant agreed to sell the property known as The Cincinnati Enquirer, as a going concern to Portsmouth Steel Corporation and a group of employees of The Cincinnati Enquirer, who caused the plaintiff to be incorporated under the laws of Ohio to receive the title from the seller, which sale was consummated by bill of sale to the plaintiff corporation.

The Cincinnati Enquirer is, and has been for many years, a morning newspaper of wide circulation published in Cincinnati, and was wholly owned by John R. McLean, who died testate, on June 19, 1916.   Admittedly, he left a large estate, of which The Cincinnati Enquirer was only a part.   What proportion it bore to the whole estate does not appear.

By his will, John R. McLean created a trust of his entire

estate including The Cincinnati Enquirer, and named American Security & Trust Company, the defendant, as trustee thereof. Edward B. McLean was the beneficiary during his life and he was named as a co-trustee, but resigned many years ago. The will provided that after the death of Edward B. McLean his descendants should receive the income until the youngest reached the limit allowed by the rule against perpetuities, when the corpus should be distributed and the trust terminated.

John R. McLean resided in the District of Columbia at the time of his death, and his will was duly probated in the District Court of the District of Columbia, and the administration of the trust has been under the supervision and jurisdiction of that court during the intervening years. American Security & Trust Company as testamentary trustee has controlled and operated The Cincinnati Enquirer as a morning newspaper and was so operating it up to June 6, 1952. The trustee apparently deemed it prudent to separate the operations of the newspaper from its other activities as trustee, perhaps, principally for the purpose of determining whether the newspaper was producing a profit. In pursuance of this purpose, those in active charge of the business in Cincinnati reported frequently to the trustee in Washington. They made monthly reports and the trustee employed independent public accountants who prepared annual balance sheets for the information of the trustee. The last balance sheet prior to this sale showed the assets of the John R. McLean estate used in the business and the liabilities incurred in the operation of The Cincinnati Enquirer as of December 31, 1951. These balance sheets also showed the method uniformly followed in listing assets and in determining the accrual of the maturity of obligations. At the trial of this action, the defendant sought to account for its method of accrual by referring to the terms of the will and the orders of the District Court based thereon. This was met by the assertion that the contract provides that the law of Ohio should govern, but, as we view this subject, the law of the District of Columbia is not law in Ohio, and its admissibility must be determined just as the admissibility of any other evidential fact is determined. Furthermore, the reason for adopting a particular method of including or excluding an asset or liability is entirely immaterial. The only con-

ceivable purpose of this evidence was to identify the subject matter of the contract and sale.

In February 1952, it became known in Cincinnati that the Cincinnati Times Star had made an offer of $7,500,000 for The Cincinnati Enquirer. This incited certain employees into activity, and a committee of employees was formed for the purpose of soliciting financial support for the purchase of the Enquirer by the employees. This committee induced the Portsmouth Steel Corporation to submit an offer of $7,600,000, under an agreement to assign the contract to the employees or a corporation formed by them. This offer was accepted by the defendant, effective June 6, 1952, the "closing date," and this contract was made, which is before the court to determine the rights of the parties thereunder.

It should be noted here that the plaintiff must be charged with all the knowledge of the members of the committee who organized it, and most, if not all, continued in active control of the Enquirer after the transfer. While each member may not have known all the facts, their composite knowledge, without doubt, embraced all the essential facts of just how the defendant had operated the newspaper and kept the records, so as to give it, so far as possible, an identity separate and apart from the rest of the trust estate.

The contract and supplemental contract intended to effect the transfer of title to a large and going newspaper, without interruption, as was to be expected, is rather voluminous, but counsel in their briefs have agreed that only a few provisions are involved in this inquiry.

Under the heading "Assets To Be Purchased," the subject matter of the sale is described as follows:

"The assets sought to be purchased by this offer consist of the newspaper business known as The Cincinnati Enquirer, as a going concern, including * * * all the assets owned by the trustee and used by it in the operation of said business at the closing date. * * * with such changes in said business and assets and only such changes therein as shall have occurred in the ordinary course of business in the operation of the Enquirer after December 31, 1951, excluding however, the sum equal to the undistributed earnings derived from the operation of the Enquirer

at the close of business on closing date, such earnings to be subject to the liabilities of the Enquirer not assumed by Portsmouth under the provisions of paragraph 3 hereof.''

The contract also provided:

''That the trustee deliver to Portsmouth or its nominee the balance sheet of the Enquirer as of the close of business December 31, 1951, and as of the date of acceptance of the offer, and a statement of the operations and earnings of the Enquirer during the period from December 31, 1951, to closing date, which statements shall be prepared by the Enquirer's independent accountants, or other independent public accountants selected by it, and shall be prepared in accordance with the same accounting principles as were used in preparing the balance sheet as of the close of business December 31, 1951.''

The contract further provided that:

''The balance sheets of the Enquirer delivered and to be delivered to Portsmouth [plaintiff] have been and will be prepared by Messrs. Peat, Marwick, Mitchell & Co., independent public accountants, in accordance with sound accounting principles and principles used in the past in Enquirer audit reports and to the best of the trustee's knowledge and belief, the balance sheet as of December 31, 1951, fully discloses the trustee's assets and liabilities relating to the Enquirer at the closing of business December 31, 1951, and since such date there has been and until closing there will be no substantial change in such assets or liabilities other than in the ordinary course of business, or as approved by Portsmouth.''

The necessity for most of these provisions was, that at the time (June 6, 1952) there was no audit or balance sheet of that date setting forth the assets, credits and debits, constituting the business unit known as The Cincinnati Enquirer. The nearest approach was the balance sheet of December 31, 1951, which had been furnished to some of the members of the employees' committee, and which had been familiar to some from its inception. So they used it as an appropriate description of the subject matter of the sale with the provision for a statement of the operation from January 1, 1951, to the date of the contract, already noted as June 6, 1952.

In September 1952, the defendant furnished the plaintiff

with a report of the operations of the newspaper from January 1, 1952 to June 6, showing a net profit of $85,999.27, and, as defendant under the contract was entitled to the net earnings, it demanded payment.

Under the terms of the contract $200,000.00 of the purchase price had been placed in escrow to secure performance by the plaintiff. The defendant also demanded that the plaintiff release this deposit in escrow. Both demands were denied. This action for a declaratory judgment was filed shortly thereafter.

The trial court found all the issues in favor of the defendant. The plaintiff duly appealed to this court.

The record shows that with the exception of the Associated Press bond for $1,000, of which defendant was the payee, the dispute relates to the operation of The Cincinnati Enquirer from December 31, 1951, to June 6, 1952. During that period the plaintiff had not been organized, and, for about half of that time no negotiations for the sale to the employees were pending. The operation was under the control and direction of the defendant, and the actual conduct of the business in Cincinnati was carried on through employees, many of whom became members of the employees' committee. And monthly reports of the operation of the business were prepared and taken in person, as a usual thing, by Mr. Ferger and submitted by him to the defendant in Washington. In each of these monthly reports (5 in number) there was included a debit item for depreciation and a check was forwarded to defendant for the amount of each item. By the end of May, these items totaled $45,985.67.

In the audit of the operation of the newspaper for the period from December 31, 1951, to June 6, 1952, that amount, $45,985.67, was deducted from earnings. No further mention was made of the item. It is conceded that this item was treated in exactly the same way in all the annual audits for years, and, as the amount had already been paid, that fact was noted in the audit of 1951, of which the plaintiff's organizer had possession during the negotiations with the defendant. At no place in that balance sheet was it listed as an asset, nor was the money represented by it in fact being used in the Enquirer business. It had been taken from The Cincinnati Enquirer and merged with assets of the McLean Trust not so used.

However, the plaintiff contends that as this withdrawal was denominated "depreciation" a balancing item should appear in the assets column of either money or property. The plaintiff, therefore, contends that the audit for the period ending June 6, 1952, must be surcharged in that amount. The plaintiff bases its contention on the terms of the warranty already quoted and construes that warranty to require the audit to be made in accordance with sound accounting principles without reference to the prior practice of the defendant.

On the other hand, the defendant points to the fact that at that time the defendant was the sole proprietor, as trustee, of The Cincinnati Enquirer, with the right to manage and control it as it saw fit, subject only to the supervision of the District Court of the District of Columbia; that it established a mode of transacting the business; and that, under this contract of sale, it had the right and was obliged to, and did, report on it for the period, without any deviation from the mode established over the years.

There is no doubt that the evidence supports the defendant's contention. Much evidence was presented to show the reason underlying the withdrawal of the items of depreciation from the business of The Cincinnati Enquirer, but there is no doubt that the items were withdrawn and then merged in the corpus of the trust estate under administration in the District Court of the District of Columbia. Whatever the reason, it was sufficient to the trustee and the District Court. The item ceased to be property used in the operation of the Cincinnati Enquirer.

But the plaintiff says that this was not in accordance with sound accounting principles as applied to corporations. It seems a sufficient answer to this to point out that the owner of The Cincinnati Enquirer at the time was not a corporation, but was an individual with full power to manage its own property as it saw fit, and who could increase or diminish the property dedicated to any specific activity, such as The Cincinnati Enquirer. As sole proprietor, the liability of the defendant was unlimited for its debts, for payment of which the entire trust estate might be engulfed.

Let us consider the terms of this contract, to determine

whether it makes sound accounting principles the lodestar for determining its meaning.

Reverting to the purchase contract, it was to "sell the assets owned by the trustee and used by it in the operation of said business." That language seems direct and unambiguous. And it was also provided in the purchase contract that the defendant should deliver to the plaintiff the balance sheet of December 31, 1951, then in existence, and also a balance sheet as of June 6, 1952, which was not in existence, and that that balance sheet should be prepared "in accordance with the same accounting principles" as were used in preparing the balance sheet as of the close of business December 31, 1951.

Reference to sound accounting principles was mentioned for the first, and only, time in the warranty, which we have quoted. But the mention of sound accounting principles was coupled with "principles used in the past in Enquirer audit reports."

Now, assuming a clash between "sound accounting principles" and principles used in the past in "Enquirer audit reports," which is to prevail? It will be noted at once that the two are connected by the word, "and." This word always has a conjunctive purpose, but it also has a large meaning depending on the connotation. This is pointed out in 3 Corpus Juris Secundum, at page 1067, where it is said:

"* * * While it is said that there is no exact synonym of the word in English, it has been defined as meaning 'along with,' 'also,' 'moreover,' 'and also,' 'as well as,' 'besides,' 'in addition to,' 'joined with,' 'together with,' and 'with,' has sometimes been held to be the equivalent of 'provided;' * * *"

In *Heald* v. *City of Cleveland*, 19 N. P. (N. S.), 305, at 323, 27 O. D., 435, we find this statement:

"It will be noticed that the word 'public' is repeated after the conjunction 'and' in this subdivision. The word 'and,' as defined in the Century Dictionary, is a colorless particle without an exact synonym in English, but expressed approximately by 'with,' 'along with,' 'together with,' 'also,' 'moreover,' the elements connected being grammatically co-ordinate."

A reference to any standard dictionary will disclose authority for the court's statement that the elements connected

are co-ordinate, and that by co-ordinate is meant, that the elements are equal in importance. If it were necessary to limit the use of "and" to its conjunctive purpose, the effect would be, in case of conflict in the application, to create a complete stalemate. The provision would be self-defeating. However, there is no necessity for attributing such a frustrating interpretation. The parties must be presumed to have intended something from the language. As shown by the quotation from Corpus Juris Secundum, the word, "and," carries with it other meanings, such as "along with," "also," "as well as," "in addition to," etc., depending on the context, and it is given such meaning as would harmonize it with the context and the manifest intent.

And every incident of this sale leads to the conclusion that "sound accounting principles" were not intended to supplant or modify in any way the method employed by the defendant, whereby defendant had established the property known as The Cincinnati Enquirer. As already pointed out, the only purpose of this accounting was to identify the changes in the subject matter by the operation from January 1 to June 6, 1952.

We, therefore, hold that the $45,985.67 transmitted to the defendant at Washington was withdrawn from the mass of assets constituting The Cincinnati Enquirer and formed no part of such assets on June 6, 1952, and formed no part of the assets transferred on that date.

As to the item of $1,838.52, representing the proportionate "depreciation for the month of June," this sum must be regarded as having arisen out of the operation of the Enquirer for the first six days of June, and formed a part of the assets included in the sale. It arose out of, and had never been separated from, the aggregate mass, and was being used in the business. What effect its inclusion may have had upon the other items of the audit, we do not stop to consider.

What we have said about the "depreciation" payment for the year 1952 applies with equal force to the amounts transmitted in 1951 to the trusts in Washington.

In the contract of purchase, is this provision relating to the outstanding obligations of the Enquirer:

"The liabilities which Portsmouth will assume and agree

to pay or discharge, should this offer be accepted, are the following liabilities of the Enquirer outstanding on and after closing date to the extent that such obligations have not been paid and satisfied in the ordinary operation of the Enquirer prior to closing date:

"(a) All those debts, liabilities and obligations of the trustee as of closing date, which are reflected or reserved against on the audited balance sheet of the Enquirer as of closing date, to be prepared by the Enquirer's independent public accountants, but only to the extent so reflected or reserved against, excluding the $300,000 working capital advance from the trustee referred to above.

"(b) All the liabilities and obligations of the trustee arising out of contracts or commitments entered into in the ordinary conduct of the business of the Enquirer, which are outstanding on closing date, including the obligations of the trustee under its lease with The Cincinnati Enquirer Building Company.

"(c) The employment contract with Roger H. Ferger dated January 30, 1948.

"(d) The employment contract with Eugene S. Duffield dated April 5, 1950."

These same provisions are contained in the bill of sale.

Many of the employees of The Cincinnati Enquirer were members of labor unions, and their contracts of employment had been negotiated by the unions. One of the provisions was that the employees should be entitled to "vacation pay" dependent on the length of total service and the number of days of work during the year. For at least fifteen years the contracts of employment had contained this provision. For reasons of convenience, perhaps, the Enquirer did not debit itself with this vacation pay as it accrued, but made the computation as the occasion arose, and, upon payment, charged it as an expense at that time, which was always in the following years. This practice had been followed for years and had been set forth continuously in the annual audits. On June 6, 1952, the employees were entitled in the aggregate to $95,200. The audits of 1952 showed this as a liability assumed by the purchaser.

The plaintiff contends that no part of this item should be

included in the obligations assumed by it. The defendant claims all of it should be included, and the trial court so held.

As we understand this record, it shows that this vacation pay was in the process of accrual from day to day as the employee worked and that the amount accrued and unpaid at the time of the sale herein was $95,200. It seems to us that this obligation was clearly assumed.

In the contract of employment of Mr. Ferger and Mr. Duffield were provisions entitling them to a certain per cent of the net earnings over a certain stipulated amount, calculated on a calendar year basis.

At the time this contract of sale was executed, it was wholly contingent whether either Ferger or Duffield would be entitled to any bonus at the end of the current year. Plaintiff would stop in midyear and make a calculation as of the date based on an estimate which would be inadmissible on any theory. But this liability, whatever it is, was assumed by the plaintiff by the express terms of the contract. Furthermore, the audit of 1952 treated this liability in exactly the same way it had been treated in prior audits.

The last disagreement of the parties relates to a bond for $1,000, issued by Associated Press, and payable to defendant. A similar bond, payable to John R. McLean, was found in his safety deposit box, and the present bond was substituted for it. Neither bond was ever included as an asset of The Cincinnati Enquirer. It was contended that this bond should have been included in the assets purchased. It was argued that as only newspapers could own such bonds, and as only newspapers could be members of the Associated Press, and that as access to the news service of the Associated Press was important, if not vital, to the successful operation of The Cincinnati Enquirer, that, therefore, it must be considered as a part of the assets purchased. However, the premise is faulty, in that it does not state that ownership of such a bond is a condition precedent to obtaining the news service of the Associated Press—and the record shows the contrary.

So we find that the court did not err in holding that the Associated Press bond was not a part of the assets purchased.

Except as indicated herein, we find no other error in the record.

For these reasons, the judgment is modified by a declaration that the item of $1,838.92 is not a liability assumed by the plaintiff, and, as thus modified, the judgment is affirmed.

*Judgment affirmed.*

HILDEBRANT, P. J., concurs.

LONG, J., dissenting. This is an appeal by the plaintiff, appellant herein, from a judgment of the Court of Common Pleas on questions of law. It is an action for a declaratory judgment, wherein the plaintiff sought to have the trial court determine its rights under a contract for the purchase of the business and assets of the newspaper known as The Cincinnati Enquirer as a going concern. Because of the fact that reference thereto will be hereafter made in this opinion, it is necessary to set out a brief history of the newspaper itself.

John R. McLean was the owner and publisher of the Enquirer until his death on June 9, 1916. By his will, he provided that the American Security & Trust Company was to act as a trustee in the operation of the newspaper. On February 14, 1952, the Cincinnati Times Star, an afternoon newspaper, was interested in acquiring a morning newspaper, and made an offer of $7,500,000 for the purchase of the Enquirer. Before this offer was approved by the District Court of the District of Columbia, which court was administering the John R. McLean Trust, the employees of the Enquirer, through a duly authorized committee known as the "Employees' Committee, for Employee Ownership of The Cincinnati Enquirer," made an offer of $7,600,000 for the purchase of the paper. The trustee was willing to recommend to the court that this offer be accepted, provided the entire amount would be paid in cash within three days. On June 6, 1952, the Portsmouth Steel Corporation, which had been importuned therefor, put up the cash and nominated the plaintiff to receive the assets of the Enquirer. By way of protection of itself and the plaintiff, it was agreed that $200,000 of the sale price should be held in escrow by the defendant until

defendant had "fully performed and carried out (its) obligations under such offer." The sole dispute in the case, it seems to me, is whether the defendant, as the seller of the newspaper business known as The Cincinnati Enquirer, as a going concern, has fully performed its obligations under the agreement, all according to the terms of the contract of purchase.

Paragraph 2 of the agreement sets forth the assets to be purchased as follows:

"The assets sought to be purchased by this offer consist of the newspaper business known as The Cincinnati Enquirer, as a going concern, including * * * *all the assets owned by the trustee and used by it* in the operation of said business at the closing date, * * * with such changes in said business and assets and only such changes therein as shall have occurred in the ordinary course of business in the operation of the Enquirer after December 31, 1951, excluding, however, the sum equal to the undistributed earnings derived from the operation of the Enquirer at the close of business on closing date, such earnings to be subject to the liabilities of the Enquirer not assumed by Portsmouth under the provisions of Paragraph 3 hereof." (Emphasis added.)

Supplementing the purchase contract, it was provided by Paragraph 6 (c) that a bill of sale covering the assets and business to be purchased be delivered to the purchaser, and further:

"(c) That the trustee deliver to Portsmouth or its nominee the balance sheet of the Enquirer as of the close of business December 31, 1951, and as of the date of acceptance of the offer, and a statement of the operations and earnings of the Enquirer during the period from December 31, 1951, to closing date, which statement shall be prepared by the Enquirer's independent accountants, or other independent public accountants selected by it, and shall be prepared in accordance with the same accounting principles as were used in preparing the balance sheet as of the close of business December 31, 1951."

Under Paragraph 9 (c) of the contract of purchase the defendant warranted as follows:

"(c) The balance sheets of the Enquirer delivered and to be delivered to Portsmouth [plaintiff] have been and will be

prepared by Messrs. Peat, Marwick, Mitchell & Co., independent public accountants, in accordance with *sound accounting principles and principles used in the past in Enquirer audit reports and to the best of the trustee's knowledge and belief,* the balance sheet as of December 31, 1951, *fully discloses* the trustee's assets and liabilities relating to the Enquirer at the closing of business December 31, 1951, and since such date there has been and until the closing there will be no substantial change in such assets or liabilities other than in the ordinary course of business, or as approved by Portsmouth." (Emphasis added.)

Thereafter, on June 6, 1952, the bill of sale was delivered to plaintiff accompanied by financial statements as of December 31, 1951.

When the June 6, 1952, financial statements were delivered, they disclosed undistributed earnings of $85,999.27; and the defendant thereupon demanded remission of this sum and a release of the $200,000, held in escrow. Plaintiff disputed defendant's position, and claimed a violation of the contract on the part of defendant. This resulted in the present law suit.

Defendant filed a cross-petition, which by reason of stipulation is not before the court, and another stipulation identifies certain exhibits and states the background of certain claims and the amounts involved.

The appellant, plaintiff below, claims generally that the judgment of the trial court is against the weight of the evidence, is contrary to law, and, therefore, should have been in its favor.

I have read the contract over and over again. After all the talk about the situation being unique factually and the relation of the parties being unusual, it seems to me that we must gather the intention of the parties from the language of the contract. The trust laws of the District of Columbus have nothing to do with this case. The sole question is whether the defendant has performed its contract. The parties agreed that the contract "shall be construed and enforced and governed by the laws of the state of Ohio." What did they mean when they agreed that all assets and liabilities were to be determined by the application of "sound accounting principles?" Let us examine the record.

The first question in dispute is the so-called "depreciation

issue.'' Under this heading two situations are presented: (1) the so-called 1952 short year, covering the period January 1, 1952, to June 6, 1952. Charges for depreciation against earnings amounted to $47,824.19; however, all of this amount was remitted to defendant prior to the date of the contract, June 6, 1952, but after December 31, 1951. The contract does not permit changes after December 31, 1951, except in the ordinary course of business; and just because the balance sheet of June 6, 1952 omits this item, does not deprive it of its character as an asset, according to my concept of sound accounting.

The same is true with reference to the depreciation for 1951 in the amount of $115,647.17. In my opinion, the past practices of the defendant in this regard mean nothing in the light of the warranties of the defendant with respect to financial statements and the obligations of defendant at the closing of the deal. It is my judgment that the trial court was in error in holding that plaintiff has no claim to the 1952 short-year depreciation and in limiting plaintiff to a credit of only $1,838.52 for depreciation from January 1 to June 6, 1952. Comment is made as to footnotes at the end of financial statements, explaining the practice of monthly remittance for depreciation, but this does not bind plaintiff. The trustee could do anything it wanted in the operation of the newspaper, providing, of course, that it satisfied the court, under whose supervision the paper was being operated. But, after December 31, 1951, it was bound by the contract of June 6, 1952. Was it just partly bound by the contract? No, it was bound not only by the warranties, but also, in the determination of the assets, it was bound to employ sound accounting policies. I agree with plaintiff that it did *not* buy the December 31, 1951, balance sheet. In my opinion, the December 31, 1951, balance sheet was not complete according to sound accounting principles, as testified to by the accountants, and the plaintiff should not be bound thereby.

The next point for decision is the vacation pay issue. I can not agree with the trial court's conclusions on this issue. If I am correct in my judgment on the depreciation issue, then I must find against defendant on this issue. According to the terms of the contract, the past practices of the defendant have no bearing on this point; those practices can not bind plaintiff,

if those practices are not in conformity with sound accounting. Sound accounting is what plaintiff bargained for and paid for, the notes at the bottom of the statement to the contrary notwithstanding. According to the record, as I see it, all other debts and liabilities of the Enquirer were considered on an accrued basis. Why was vacation pay omitted, except for reference to it in a footnote? To say that it was done consistently in the past, is not binding on plaintiff. It might have been done to determine income payable to the beneficiaries of the trust, but is this sound accounting under the circumstances of this case? There is no dispute that when vacation pay was referred to in the June 6, 1952, statement it was not reflected on the balance sheet. Why? Mere reference to such an item by footnote does not reflect it in the balance sheet, and, therefore, plaintiff did not assume this item under the contract. Again, the trial court excuses performance by defendant on this issue on the ground that defendant could "not legally have accrued vacation pay" under laws of the District of Columbia. Again, I say, the law of the District of Columbia has nothing to do with this contract. The court of the District of Columbia authorized the defendant to enter into a contract which provided: "10. Law Governing: Any contract that may result, either express or implied, by reason of the trustee's acceptance of this offer, shall be construed and enforced and governed by the laws of the state of Ohio." In my opinion, even the court of the District of Columbia should be bound by this provision, unless, perchance, there has been a fraud on the court, which nobody is claiming.

I now come to a consideration of the executive bonuses issue. In order to understand the respective claims of the parties on this subject, it is necessary to consider the contracts which the executives had with the Enquirer. The commissions payable to them were based, among other things, on "miscellaneous net income." According to the evidence a "Black & White Press" was sold by defendant in January 1952, at a profit of some $34,429.29. The question is whether the executives are entitled to their respective commissions on this profit as "miscellaneous net income." It appears further that the exclusion of the gain on the sale of the press in the earnings was expressly ordered by defendant, although the accountants believed that

sound accounting dictated its inclusion. Their explanation is that the net result to executives' bonuses would be so small that they agreed to omit the gain on the press. In view of this evidence, about which there is no dispute, sound accounting would require that executive bonuses should be reflected as an annual expense and prorated as of the closing date. Accordingly, judgment should be rendered for plaintiff on this issue in the amount claimed in its petition.

Finally, we come to a consideration of the Associated Press bond issue.

Prior to his death in 1916, John R. McLean owned a $1,000 bond of the Associated Press, which became part of the trust estate at his death. This bond was subsequently exchanged or sold by the trustee, and the defendant bought in its place a $1,000 debenture bond of the Associated Press. Under the charter and bylaws of the Associated Press Association, only members could own such a bond. In other words, McLean's ownership of the Enquirer entitled him to purchase the bond. However, there is no evidence that a member was required to buy a bond in order to receive the news service of the Associated Press, or that the ownership of the bond entitled its owner to any additional services from the Associated Press. Therefore, it is evident that the bond was not an asset used by the trustee in the operation of the newspaper, and, under the contract of sale, did not pass to plaintiff as an asset.

It is urged that those people who were interested in buying the newspaper had knowledge, over the years, of the manner of operation of the Enquirer; that they knew the customs of accounting between the operators of the newspaper and the trustee, and, for that reason, the purchasers in some mysterious way are estopped from complaining about what they ought to get under their contract of purchase. On the other hand, it may be their knowledge of what was going on that induced them to insist that the assets which they were to receive were not only in accordance with "principles used in the past in Enquirer audit reports" but also "in accordance with sound accounting principles." It is to be noted in this respect that the contract uses the conjunctive. Balance sheets were to be prepared in accordance with "sound accounting principles *and* principles

used in the past.'' It is no excuse to say that the past performance of the Enquirer did not accrue vacation pay, and that, therefore, the purchasers cannot receive a credit for this item. But the contract says that such a performance must be ''in accordance with sound accounting principles'' even though it has been otherwise for ten years.

And then we come to testing the so-called expert testimony. It is argued that the court should not be concerned except to accept the testimony of the expert. In the first place, there is no dispute that the independent experts excluded ''executive bonuses'' as an item in their certificate because it was suggested that the amount was so small that it would not be material in the over-all report. But they admit that it should be included. Again, under the issue of ''vacation pay'' the firm of accountants which reviewed the books of the Enquirer over the years stated in its June 6, 1952, statement that ''vacation pay'' should be accrued. ''In our opinion,'' says the statement, ''subject to the qualification in regard to *the omission of an accrual for vacation pay,* the balance sheet presents fairly, the financial position of the Enquirer * * *.'' (Accountant's Report.)

Then, again, in the certificate attached to the December 31, 1951, statements, these same accountants report as follows: ''All liabilities of which we obtained knowledge in the course of our examination have, *with the exception of accrual vacation pay,* received appropriate recognition.''

Testing further the testimony of the experts, upon which it is urged that the court rely, I have examined the record for a definition of ''sound accounting principles.'' I do this for the reason that there is no dispute that the purchasers of this newspaper contracted to buy assets which were to be determined by ''sound accounting principles.'' And, yet, by way of example, we find this testimony in the cross-examination of Bernard W. Cochran, called by defendant, who is in charge of the Washington Office of Peat, Marwick, Mitchell & Co., the accountants who represented the defendant in its management of the Enquirer up to the time of its sale to plaintiff. The witness was asked if he didn't testify that ''it was not good accounting practice at that time to accrue vacation pay.'' The witness answered in the affirmative. Then he was asked whether he, or the auditor who

made the audit, would be in a better position to testify as to good accounting practices. His answer was: "Well, I might have been in a better position.

"Q. You would rather express the opinion without making the audit? A. I might have been in a very good position to state whether that was good accounting practice. *I am not saying.*

"Q. You mean you don't want to answer the question? A. I see no reason why I should make a statement here that what they did was wrong. That was their opinion."

Thereupon, the court undertook to get an opinion from the witness as to whether, being in Washington, he could better judge the soundness of the accounting.

"A. Your Honor, I couldn't answer that yes or no because I have been working with these people, looking at these reports, knowing everything about the accounts, seeing all of these contracts that have been made on these bonuses, advising the Trustee, accounting-wise, *of what should be done in the Enquirer lots of times, and I know the background of this whole thing* and I am not taking any responsibility of saying *what they should have done.*"

In my opinion, this witness, better than all others, could have said, if he so believed, that everything done was according to sound accounting, but he was "not taking any responsibility." It is, therefore, obvious that this witness contributed nothing to the quest of the court to ascertain what is, and what is not, sound accounting; nor, on this same issue, is the witness Peloubet, who has a yen for consistency as one of the three attributes of good accounting, any assistance to the court.

As I view this case, the only question to be determined is whether the plaintiff is getting what it purchased, to wit, all the assets of The Cincinnati Enquirer; those assets to be determined not only according to the "principles used in the past in Enquirer audit reports" but also "in accordance with sound accounting principles."

In my opinion, with the exception of the Associated Press bond, there is no evidence in this record which justifies the judgment of the lower court. That judgment should be reversed, and, with the exception of the Associated Press bond, final judgment should be rendered in favor of plaintiff on all other issues.