CHELSEA INDUSTRIES, INC.,
Plaintiff, Appellant,

v.

ACCURAY LEASING CORPORATION,
Defendant, Appellee.

No. 82–1426.

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1983.
Decided Feb. 3, 1983.

Nathan T. Wolk, Boston, Mass., with whom Lane & Altman, Boston, Mass., was on brief, for plaintiff, appellant.

James C. Donnelly, Jr., Boston, Mass., with whom James D. St. Clair, and Hale & Dorr, Boston, Mass., were on brief, for defendant, appellee.

Before ALDRICH and CAMPBELL, Circuit Judges, and PETTINE,* Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

This is an action brought by Chelsea Industries, Inc. against AccuRay Leasing Corporation seeking a declaration that Chelsea had duly exercised an option to purchase a certain computer system that was under lease to it by the defendant, and for appendant relief. The basic question is the meaning and effect of defendant's December 30, 1974 "policy" letter delivered, the court found, in a "binder [which] included documents entitled Lease Agreement, Operating Results Evaluation [which was an amendment to the lease, and a] Service Maintenance Agreement. . . ." Although defendant's negotiator testified that the binder content was referred to as a "package" by defendant's signing representative, defendant contends that the policy letter was not part of its total contractual obligation. The case was tried to the court which, after a detailed opinion, entered judgment for the defendant. The court found that the letter was not an option, but simply an expression of a possible basis for a future agreement,

and that, even if it purported to be an option, it was improperly exercised. We reverse.

Plaintiff comes to this court making three contentions. The first is that it discovered shortly before trial that defendant had defrauded it by intending not to make the agreement plaintiff had understood had been made, and that the court erred in not permitting an amendment of the complaint by adding a count for fraud. The court denied the motion as untimely. The short answer to this is that, as will be developed, post, defendant was bound by the contract in .the terms that plaintiff understood. Plaintiff, accordingly, was not defrauded.

Next, the first ground of the complaint as filed is that the policy letter, as an option, was an addendum to, and part of, the lease. The third is that even if not part of the lease, it was part of the total agreement. Since we agree with this last, the addendum issue is superfluous. We shall, however, deal with it, in part because the parties devoted so much time to it, both below and here, and in part because the question of the substantive meaning of the letter is the same in whichever posture it is considered. We begin with the meaning.

The body of the letter reads as follows. Gentlemen:

Reference: Lease Agreement Number 74–1030

It is the policy of AccuRay Leasing Corporation to provide for the conversion of the leased equipment to a purchase at anytime during the lease agreement. These are converted at the fair market value of the leased equipment. The fair market value is based on the installed value, in the amount included in the lease agreement; but shall not exceed the percentages as indicated below on our eight (8) year lease agreement.

| End of Month | % of Installed Price ($793,630.00) |
|---|---|
| 12 | 92 |
| 24 | 84 |
| 36 | 74 |
| 48 | 63 |
| 60 | 51 |
| 72 | 37 |
| 84 | 22 |
| 96 | 10 |

* Of the District of Rhode Island, sitting by designation.

. It is our policy not to go below 10% of the installed price of the leased equipment. The above schedule is based on receiving full payments during the initial term of the lease agreement.

The installed price includes the equipment price, and the initial services (Installation Supervision, Correlation, Certification, and Initial Systems Engineering) and cable. If any up-dating of the leased equipment is done, the fair market value of the up-date will be added to the conversion price.

In its correspondence rejecting plaintiff's assertion of an option and attempt to exercise it defendant characterized this letter as a "policy . . . to provide for the conversion of leased equipment to a purchase," a "guideline" letter of no legal consequence. In its brief defendant says the letter "merely describes a policy which is hospitable to conversion." The court called the letter a "conversion letter," but came to the same conclusion of emptiness. "The conversion letter . . . was intended as a statement of policy, describing the conditions under which the parties could agree to a conversion to a purchase if such a purchase was advisable under the existing circumstances."

> The court's further findings were, "The evidence adduced at trial shows that Futura [plaintiff's assignor] wanted an option to purchase, and that AccuRay accordingly provided the letter at the closing."

Viz., Futura wanted an option to purchase, and defendant "accordingly" gave it nothing.

> "The conversion letter was the result of negotiations between competent and knowledgeable parties."

Ergo, plaintiff knew it was negotiating for nothing.

In reaching this seemingly anomalous conclusion the court possibly got off on the wrong foot by overlooking an answer by defendant's negotiator, Speedie, a needle in a veritable haystack of a deposition. Although Speedie's examination left it that defendant did not intend to give an enforce-able option, there was no contradiction of his testimony of what plaintiff was intended to understand.

Q. Was there an intent on the part of AccuRay to convey to Chelsea and Futura the impression that they were getting a contractual right—by giving them the so-called policy letter?

A. In my judgment, yes.

Mr. Casty, plaintiff's representative, testified that this was what he, in fact, understood. In reporting back to the plant he called it "a side letter of buy out," an exceptionally accurate description. The concept that it was to be read in as an addendum to the lease appears to be plaintiff's counsel's. While the court made unfavorable remarks about Casty, there was no basis for finding him untruthful on this particular point—he could believe what he was intended to believe.

In deciding whether plaintiff received something of consequence, as it contends, or nothing, as defendant claims, there are a number of standard rules of construction. Since the lease states that Ohio law is to govern, we emphasize Ohio cases, but observe that we find no difference between Ohio and Massachusetts, the forum.

The first principle is that there is a normal assumption that a business transaction is not meaningless and that words have a purpose. See *Cincinnati Enquirer, Inc. v. American Security & Trust Co.,* 1958, 107 Ohio App. 526, 160 N.E.2d 392, 398; *National City Bank v. Citizens Building Co.,* Ohio Ct.App., 1947, 74 N.E.2d 273, 279; *Bray v. Hickman,* 1928, 263 Mass. 409, 412, 161 N.E. 612. The next, which needs no citation, is that a contract is what the parties reasonably understand. A corollary to this must be that if one party causes the other to have a particular understanding, that is the contract. "[O]ne is bound, not only by what he subjectively intends, but by what he leads others reasonably to think that he intends." *Bach v. Friden Calculating Mach. Co.,* 6 Cir., 1946, 155 F.2d 361, 365. "Knowingly to lead a person reasonably to suppose that you offer and to offer are the same thing." *Brauer v. Shaw,* 1897,

168 Mass. 198, 200, 46 N.E. 617, *quoted in Timmins v. F.N. Joslin Co.,* 1939, 303 Mass. 540, 542, 22 N.E.2d 76. A third principle, not necessary here, but corroborative, is that in case of doubt, an instrument is to be taken against the party that drew it. *Lytle v. Freedom Int'l Carriers, S.A.,* 6 Cir., 1975, 519 F.2d 129, 135; *Opportunity Consultants, Inc. v. Tugrul,* 1976, 1 Ohio App.2d 403, 354 N.E.2d 698, 699.

These principles would be violated by defendant's construction that the "letter . . . merely describes a policy which is hospitable to conversion." Plaintiff knew from the outset that defendant preferred a sale to a lease; its future interest would be price. There was no need, nor point to "negotiate" for a price policy that defendant could change at will. It would be only natural for plaintiff to believe that an adjustable schedule, addressed to the entire term of the lease, had an affirmative meaning. Defendant's now seeking to label the schedule a discount table overlooks the fact that it was adjustable downward in case of a decline in fair market value. The presence of such detail precisely supported Speedie's concession of what defendant intended plaintiff to understand. At trial Speedie referred to it as a "comfort letter," apparently an accountant's term. A policy changeable at will would be cold comfort— the comfort would last only until plaintiff sought to avail itself of it. We consider plaintiff's understanding far too reasonable for defendant, who intended it, to contend otherwise.

With respect to the fact that defendant was the drafter, while defendant argues at length about the meaning of the word "policy," it cannot avoid the fact that the letter constituted a sufficient expression of its policy at the moment. If it was intended to be no more, it would have been simple to add the universally familiar caveat, "This policy is subject to change without notice." Under the circumstances, weight could be given to the absence of such a clause. "He who speaks should speak plainly or the other party may explain to his own advantage." *See Opportunity Consultants, Inc. v. Tugrul,* ante. All defendant can think to say in answer to the assertion that the letter is to be construed against it is that the rule is inapplicable because the letter is unambiguous. Yet in the next breath it argues that plaintiff, being represented by counsel, should have realized the letter was not part of the contract because it was not "executed in the same formal manner as the lease." We decline to accept this reason, but the important fact is that defendant advances such an argument at the same time that it seeks to say the letter was unambiguous.

The upshot is that in response to plaintiff's expressed desire for an option, defendant, as part of the package, informed it of a policy, viz., a willingness to convert on stated terms, over the period of the lease, that plaintiff was intended to believe was firm. Such belief was warranted, with the consequence that defendant was so bound.

A review of the record, disregarding Casty's testimony on other matters, if one wishes, reveals a clear picture. As a matter of general financial policy, defendant initially preferred to sell the system outright, but acceded to plaintiff's request for a lease agreement, which was based on plaintiff's belief that it would get better service. Given a leasing arrangement, defendant wished to be able to deposit the lease with a bank as collateral for a loan, and it was best that the bank be assured of the continuance of plaintiff's obligation for the stated payments. A buy out, particularly if it might be at a reduced price, could reduce the value of the security. From defendant's standpoint, accordingly, the lease should not contain an option. At the same time, plaintiff, who feared the equipment might become obsolete, expressed a strong desire for an option—its second choice after defendant refused it a right of outright termination due to obsolescence. This dilemma defendant solved by leaving the lease clear, and giving plaintiff a letter which it intended plaintiff to believe to be an option, but with the undisclosed intention that it not be. Defendant doubtless felt this to be the best solution. We believe it to be a sharp one—injurious either to the expectations of

the plaintiff, or of the bank, depending upon the assignment, if any, in effect, and how the legal issues might be resolved.

█ In rejecting plaintiff's claim that the letter was to be read as an integral part of the lease the court relied upon what it described as a "classic merger clause."

"The provisions of this Lease Agreement constitute the full and complete agreement between Customer and AccuRay, and any terms or conditions contained in any document not expressly incorporated herein are not part of this Agreement. . . . This Agreement . . . is effective from the date it is accepted by AccuRay and shall remain in full force until terminated as herein provided."

Although, in asserting this clause, defendant peppered the record with objections based on the parol evidence rule (without regard to the fact that this rule, when applicable, is not waived by failure to object, see *Ritson v. Atlas Assurance Co., Ltd.,* 1930, 272 Mass. 73, 76, 171 N.E. 448), it cites no authority indicating the rule's relevancy to the present situation. Its, and the district court's, sole reliance is upon a statutory version of the parol evidence rule contained in Ohio Rev.Code § 1302.05. This statute, by its terms, does not apply to a lease which expressly reserves title in the lessor. Section 1302.01, Definitions, subsection (A)(11) provides, " 'Contract' and 'agreement' are limited to those relating to the present or future sale of goods. . . . A 'sale' consists in the passing of title from the seller to the buyer for a price." It is regrettable that counsel should fail to cite to a busy court the material part of a foreign statute.

█ It is common for a lessor to accept the surrender of a lease, and in such event all its terms are cancelled. *See, e.g., Caruso v. Shelit,* 1933, 282 Mass. 196, 184 N.E. 460. There is equally no reason why a lessor cannot later convey the title of the subject matter to the lessee. If he can do so, he can agree to do so. Defendant has confused an entirely separate matter, whether such an undisclosed separate agreement might be invalid against a third party, such

as a bank if it, in ignorance thereof, relied on the above-quoted provision in the lease. The lease provided that defendant might assign, and it did, in fact, assign to a New Jersey bank in June, 1976. It notified plaintiff of the assignment, although not, apparently, of its terms. Whether the assignment remained in effect does not appear. Plaintiff properly joined the bank in its complaint. Instead of availing itself of this opportunity to protect its interests, if any, the bank moved to dismiss for improper venue. This motion was granted. Under these circumstances we will not concern ourselves with the bank's possible interests. Defendant has no right, vicarious or otherwise, to assert the bank's interests as a defense to plaintiff's claim against itself.

In fairness, we do not read defendant's brief as making this claim. Rather, it uses the fact that the existence of an option would impair the security value of the lease as showing it had no intention to grant one. That, however, is not the point. The question is not the private intention of the defendant, but what was the understanding of the plaintiff, particularly, in this case, what was the understanding defendant wished it to have. We are back to the beginning. And, since the bank is not concerned, it makes no substantive difference whether the conversion obligation was, technically, a part of the lease, or was a separate part of the package representing defendant's total undertaking. The court held, correctly, that a holding that the letter was not to be read into the lease did not destroy its force as a separate agreement between the parties.

Finally, defendant contends, and the court found, that even if the letter were a valid option, it was not properly exercised. First, defendant claims that plaintiff did not tender in so many dollars. Under the letter, the price was to be determined by a formula related to fair market value. Plaintiff did state, flatly, that it was exercising the option, would pay whatever was the proper figure, and asked defendant its view thereof. Instead of responding to this inquiry in terms, defendant replied that

there was no option (and, by obvious implication, no formula) but that it would sell for a certain figure. It made no suggestion that this figure was reached by applying the formula. Now it says that, because plaintiff did not pay, it lost its rights. Defendant sought to bolster this position by offering testimony at the trial—vigorously disputed by plaintiff—that the figure it named was, in fact, less than what the formula would have produced.

Defendant succeeded in persuading the district court. The court said,

"[T]he letter ... required that the entire price was to be paid in full on the date the conversion took place. Chelsea never made any such tender of performance, nor did it pursue at any time any efforts to determine a fair market value for the system."

In fact, plaintiff having initiated the inquiry there was nothing for it to pursue. The court apparently lost sight of the principle that when a defendant repudiates an agreement by denying there was one, a plaintiff is under no obligation to go further. *Wren Reese, Inc. v. Great Lakes Structural Concrete Products, Inc.,* 1975, 50 Ohio App.2d 168, 362 N.E.2d 269, 271, 273; *Unger v. Chaves,* Ohio Ct.App., 1953, 113 N.E.2d 753, 756. Having rejected the agreement, defendant's contention that there remained a duty on plaintiff "to cooperate in good faith to establish that [a] lower price would be appropriate" is simply bad law.

The court's refusal to allow the amendment alleging fraud is affirmed. Except for that, the judgment is reversed and the case is remanded for further proceedings consistent herewith.