**David COLEMAN, Plaintiff, Appellant,**

v.

**Roger DE MINICO, et al., Defendants, Appellees.**

No. 83–1194.

United States Court of Appeals, First Circuit.

Argued Feb. 9, 1984.

Decided March 23, 1984.

Michael Avery, Boston, Mass., with whom Arthur L. Johnson, Jamaica Plain, Mass., was on brief, for appellant.

\* Of the District of Maine, sitting by designation.

Arlene S. LaPenta, Boston, Mass., for appellees.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,\* Senior District Judge.

COFFIN, Circuit Judge.

Plaintiff David Coleman appeals from a jury verdict for defendant police officers. Coleman brought suit under 42 U.S.C. § 1983, alleging violations of his civil rights through the use of excessive force and as the result of an illegal arrest. As a result of a confrontation with the defendant police officers, Coleman suffered a compound, complex fracture of the front of his lower jaw, a lacerated lower lip, a lost lower incisor, several loosened teeth, and other cuts and bruises. On appeal, Coleman argues that the district court erred in admitting into evidence the opinions of defendants' expert witness concerning the cause of Coleman's injuries, which opinions the witness acknowledged to be "speculative" and which were given in response to hypothetical questions based upon facts not in evidence.

On April 18, 1977, the day of the Boston Marathon, Coleman, a young black man then an undergraduate student at Boston College, was walking with four of his friends along the marathon route on Commonwealth Avenue toward Boston College. Coleman was carrying a half-gallon bottle of wine. The parties seem to agree about the above facts but little else.

According to the testimony of Coleman and his three companions who testified, they were walking in an orderly fashion up the street between a line of parked cars and the crowd along the marathon route. The crowd was almost entirely white. Coleman and his friends did not interfere with the runners in any way. Defendant DeMinico then pushed one of Coleman's friends against a car and ordered them all off the street onto the sidewalk. DeMinico then followed them and harassed them. After Coleman turned and asked DeMinico

why he was following the group, DeMinico arrested Coleman, and a group of officers forced Coleman to the ground, handcuffed him and sprayed him with mace, but without causing any serious injury to his jaw. During the ten to fifteen minute ride in the police van en route to the police station in Brighton, Officer Kilroe began hitting Coleman on the left side with a small black object, and DeMinico hit Coleman with a night stick. The officers also directed racial epithets at Coleman. When the officers removed Coleman from the van at the station, an officer kicked Coleman several times, and Coleman squatted and kept his head low to protect himself. One officer then grabbed Coleman by the back of his shirt collar and pulled his head back, while Officer DeMinico swung his night stick and hit Coleman on the lower jaw, causing the injuries described above. No civilians witnessed this scene at the station. After the officers placed Coleman in a cell, Officer Griffiths directed several racial remarks at Coleman, spat on him, and said that he belonged in a cage and that Griffiths would kill Coleman if Griffiths ever saw Coleman in Brighton again. Lamarr Stallworth, who at the time of trial was serving a ten-year sentence for robbery and who earlier had been convicted on other charges, testified that from a nearby cell he had overheard Griffiths' treatment of Coleman. Stallworth substantially repeated Coleman's account of that treatment.

The defendant police officers and two bystander witnesses tell a far different story about what happened that day. According to the testimony of DeMinico and his fellow officers (all white males), DeMinico was assigned to control the crowd along the race route. DeMinico observed Coleman and his friends walking on the race route against the flow of the race, drinking wine and beer, blocking the runners, yelling and pouring beer on them. DeMinico

ordered Coleman and his friends onto the sidewalk, whereupon Coleman became verbally abusive. When DeMinico told Coleman he was under arrest, Coleman raised his wine bottle, and DeMinico struck Coleman on the wrist with a night stick. Then the other defendant police officers arrived and, in an attempt to restrain Coleman, everyone toppled into an iron fence bordering the sidewalk. Coleman suffered the injuries described above when his mouth accidentally struck the fence. The officers then accompanied Coleman to the station in the police van without abusing him physically or verbally. When the booking officer asked Coleman how he had injured his mouth, Coleman mumbled, so DeMinico told the officer that Coleman had fallen.[1] Griffiths testified that he neither spoke to nor spat on Coleman in his cell.

Two white residents of Brighton testified that they had been watching the marathon and had seen: Coleman and his friends obstructing the runners; Coleman verbally abusing DeMinico; Coleman violently resisting arrest; Coleman and the officers falling into the fence; and blood on Coleman's face after he had hit the fence. Two other bystanders, also both white, testified for Coleman, but we do not know the substance of their testimony, because the transcript of their testimony was not prepared for this appeal.

Defendants' final witness was Dr. Daniel Holland,[2] the oral surgeon who had treated Coleman's jaw fracture in his office on referral from the Boston College Infirmary the day after Coleman's confrontation with the police. Dr. Holland gave expert testimony on the cause of Coleman's injuries. The doctor testified, over objection, that had Coleman been struck in the mouth by a six-foot male swinging a police night stick "in a two-fisted manner", his injuries would

---

**1.** Three officers (DeMinico, Currier, and Kilroe) who participated in the arrest and who were present in the station during Coleman's booking testified that DeMinico repeated Coleman's barely audible statement that he had fallen. Only the booking officer (Marculaitis) testified

that DeMinico said that Coleman had received his injuries when he fell against an iron fence while resisting arrest.

**2.** Dr. Holland had earlier testified for Coleman, describing the injuries and treatment rendered.

have been much more severe.[3] Coleman's attorney objected to the foundation of the hypothetical question to which Dr. Holland responded, because there was no evidence that the blow Coleman claimed DeMinico struck had been delivered with two hands.

Dr. Holland testified further that Coleman's injuries could have been caused by the plaintiff's falling forcefully against a fence. Dr. Holland stated, again over objection, that if Coleman's head had come down on the horizontal section of the fence—that is, the horizontal bar that joined the vertical iron slats—it would very likely have produced the injuries Coleman suffered: a fracture of the alveolar bone (the part of the lower jaw supporting the teeth), a lost lower tooth and other loose teeth, and tooth-sized cuts in his lower lip. However, the record contained no evidence that Coleman had struck the *horizontal* section of the fence.

On cross-examination, Dr. Holland admitted that whether a night stick blow would cause a compound, complex fracture of the lower jaw would depend upon the angle and force of the blow. He further conceded that pulling the victim's head back at the time of the blow would lessen the force of the blow. He also acknowledged that the positioning of the teeth in the mouth could affect which teeth would be knocked out by the blow. Dr. Holland admitted that given these gaps in knowledge, his opinion about whether or not Coleman was injured by being hit with a night stick was "speculative", although he said he would have thought a hard blow with a night stick would have caused a more severe laceration and more severe injuries to teeth, including upper teeth. Dr. Holland made a similar admission about his opinion that Coleman's injuries were consistent with having hit the fence at the time of his arrest. Given that the doctor did not know the angle or the force with which Coleman had hit the fence, Dr. Holland admitted that his opinion that the injury could have been caused by hitting the fence was "speculative".

The overall testimony in this case set up a classic jury question. The story told by plaintiff, a young black man, and his black friends flatly contradicted the story told by defendants, all white police officers. Two of four bystanders who testified substantially corroborated the defendants' version of events at the site of the arrest. The one expert witness in the case gave his opinion, which he later admitted to be "speculative", as to the cause of injury. The jury returned a verdict for defendants.

 We affirm. We must start from the premise that the trial court has substantial discretion in determining the admissibility of expert testimony. *See, e.g., Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Polk v. Ford Motor Co.,* 529 F.2d 259, 271 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). While the factual bases for some of Dr. Holland's expert opinions as to cause of injury were incomplete, he did not base his opinions on pure conjecture. Holland personally observed Coleman's injuries the day after the incident and twice examined the fence in question to determine its height and the possibility of Coleman's head hitting it. Dr. Holland had extensive experience of more than forty years as an oral surgeon in the armed forces and afterwards, and as a member of the Harvard and Tufts faculties, with injuries of this type. All of the defense eyewitnesses—the four defendants and two bystanders—testified that Coleman struck the fence in the course of his struggle with the police and that blood was visible on his face at this time. Coleman admitted during cross-examination that he had testified in an earlier proceeding in state court that he may have struck the fence at the time of his arrest.

---

**3.** Defendants' counsel explained in her brief and again at oral argument how the reference to a two-fisted swing had crept into the case. She stated that Coleman had said in a deposition that the night stick had been swung in a two-fisted manner. She also stated that Coleman's counsel had demonstrated a two-fisted swing during his opening statement while describing the alleged blow from the night stick.

These bases for Dr. Holland's testimony that a collision with the fence may have caused Coleman's injuries distinguish this case from *Larue v. National Union Electric Corp.*, 571 F.2d 51, 58 (1st Cir.1978), in which we affirmed a district court's striking of a medical expert's testimony because there was no evidence of the facts underlying the hypothetical question to which the doctor responded.

In addition to these substantiated assumptions, Dr. Holland also made two additional assumptions not substantiated by the evidence. He assumed that Coleman hit the *horizontal* portion of the fence and that DeMinico's alleged blow was delivered *two-fisted.* We do not attach great significance to the latter assumption. This assumption may well not have been material to Dr. Holland's opinion, because it is not obvious that a two-fisted blow would necessarily cause greater damage than a one-fisted blow.

■ The assumption that Coleman hit the horizontal portion of the fence apparently arose from Dr. Holland's observation that Coleman's injuries resembled those often suffered when a person's chin comes down forcefully on an automobile dashboard—also a hard, horizontal surface. This assumption obviously influenced Dr. Holland's opinion as to the cause of Coleman's injuries. Although this assumption lacked support in the record, the doctor stated his opinion in response to a hypothetical question, the basis of which had at least partial support in the record. The jury was fully capable of deciding whether this additional assumption underlying the hypothetical was supported by evidence. Just as a court may not permit an expert to testify on the basis of pure conjecture, neither may the court exclude any and all expert testimony not premised entirely on facts already proven by evidence before the jury.

In this case the assumed facts were not contrary to facts established in the record.

No evidence had been submitted either to prove or refute the challenged assumptions: that the alleged swing of the night stick was two-fisted and that Coleman hit the horizontal portion of the fence. Nor are these facts susceptible of scientific proof. *Georgia Kaolin International v. M/V Grand Justice*, 644 F.2d 412 (5th Cir. 1981), provides an illustrative contrast to the present case. In *Georgia Kaolin*, a dock owner appealed from a damages award to a boat owner for damage caused when the boat broke away from its mooring at a dock in the Savannah River. The central issue in the case was whether the mooring was adequate to withstand the pull on the hull of the vessel caused by the incoming tide. The Fifth Circuit reversed the verdict for the boat owner, because its expert witness's assumptions as to speed of the current, height of the tide, and angle between the mooring line and the dock—all essential facts upon which his expert testimony was based—were contrary to the facts proven in the case. *Id.* at 414–17. In the case at bar, the record did not contain any evidence that contradicted the assumptions on which Dr. Holland relied in giving his opinion as to the cause of Coleman's injuries. The facts of this case, unlike those in *Georgia Kaolin*, do not lend themselves to precise quantification. Dr. Holland's opinion did not take the form of a mathematical equation with incorrect data plugged into determinative variables. Rather, Dr. Holland gave only a tentative assessment.

The tentative nature of Dr. Holland's opinions became abundantly clear to the jury during his cross-examination. Coleman's counsel subjected Dr. Holland to a vigorous cross-examination that forced Dr. Holland to admit that without the knowledge of the angle and force of either the alleged night stick blow or the collision with the fence, his opinions concerning the cause of injury were "speculative".[4] Fol-

---

4. Despite Coleman's urging, we do not attach dispositive legal significance to Dr. Holland's admission that his opinions were speculative.

It is fair to take the inference, for purposes of this review, not that his opinions were pure guesswork, but rather that they were incapable

lowing cross-examination, the jury could weigh Dr. Holland's testimony in light of the evidence and the plausibility of the inferences that Dr. Holland had drawn therefrom. *See Polk v. Ford Motor Co.,* 529 F.2d at 271 ("The weakness in the underpinnings of [expert] opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony.").

In *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 863 (10th Cir.1979), the court found no abuse of discretion in the trial court's decision to admit the expert testimony of an architect:

> "While some of [the architect's] opinions and testimony seem to have been based upon speculation derived from incomplete data, he fully disclosed any inadequacies in the information he was relying on and he was subjected to a thorough cross-examination. Trial courts have broad discretion in determining the extent to which expert testimony is admissible."

The judge in the case at bar told the jury, both during Dr. Holland's testimony and again in the charge, that the jury could weigh the credibility of the expert witness in light of the facts that formed the basis of the expert's testimony. Although a risk always exists that the jury will seek to resolve a credibility contest by relying on the "scientific" approach offered by an expert witness, any such possibility in this case was minimized by Coleman's cross-examination of Dr. Holland[5] and the court's

comments and instructions to the jury regarding the treatment of expert testimony.

This case presented a classic jury question. The jury weighed the credibility of the witnesses and returned a verdict for the defendants. As an appellate court, we must resist the temptation to resift the evidence to determine whether defendants' or plaintiff's version of the facts is more plausible. Given that the district court did not abuse its broad discretion in admitting Dr. Holland's testimony, the judgment below must be *affirmed. Parties to bear their own costs on appeal.*

---

of definitive proof. Regardless of the label that Dr. Holland placed on his opinions, he premised them on sufficient, albeit incomplete, facts that take his opinions outside the realm of "mere guess and conjecture". *Cf. Gilbert v. Gulf Oil Corp.,* 175 F.2d 705, 709 (4th Cir.1949).

5. Coleman's counsel claims that the trial judge blunted the effectiveness of the cross-examination of Dr. Holland when the judge made disparaging faces, apparently out of exasperation, during a cross-examination question. Coleman's counsel interrupted his question and approached the bench to request the judge to cease making faces. The court acknowledged that "if I expressed the annoyance, I think it was uncalled for . . . ." While we, too, expect all significant judicial communications to be of record,

we have read the relevant transcript portions and have no hesitation in holding that in this trial that understandably generated strong feelings, there was no intrusion by the court sufficient to create a danger to the jury's ability to render a verdict free from improper judicial influence. Although we rule against counsel for Coleman, we think that he took the proper action to protect his client. Counsel should not, once he has determined that some protest at body or facial "English" is necessary, hesitate to approach the court at side bar as counsel did here. And judges, just as did the judge here, should not take umbrage at criticism, excepting of course obviously frivolous and uncalled for protests.