Wallace DAVIS, Plaintiff-Appellant,

v.

Joseph FREELS, Defendant-Appellee.

No. 77–2221.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1978.

Decided Aug. 22, 1978.

As Amended Aug. 25, 1978.

---

Terrence K. Hegarty, Chicago, Ill., for plaintiff-appellant.

Peter Fitzpatrick, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Circuit Judge, MILLER, Judge,[*] and TONE, Circuit Judge.

MILLER, Judge.

Plaintiff-appellant Wallace Davis appeals from the judgment of the district court, entered on the jury's verdict, that defendant-appellee Joseph Freels was not liable for violation of plaintiff's rights under 42 U.S.C. § 1983;[1] also from an order denying plaintiff's motion for judgment notwithstanding the verdict and from an order denying his motion for a new trial.

We reverse.

## BACKGROUND

On March 8, 1976, at about 6:00 A.M.,[2] Freels, a Chicago police officer for nine years, and his partner, Joseph Daube, while on patrol in a patrol wagon received a radio communication based on a citizen's complaint that the men in a blue Camaro with a black vinyl top (license plate number given) were wanted in connection with a shooting incident. While en route to the scene of the shooting (Freels driving), the two police officers observed a car answering the description drive by in front of them. (Plaintiff was, in fact, driving the car with a passenger, Winston Fontenot.)[3] The police officers followed the car for two blocks at approximately a half-block interval. From every indication Freels had, the men in the car were not aware that they were being followed. Davis drove the car into an alley approximately one hundred feet and turned into a lot adjacent to an auto body shop allegedly owned by him. Freels drove to the entrance to the lot, and both officers then got out and walked into the lot with their weapons drawn. Davis and Fontenot were still near the rear of their car. With Davis in the lead, they walked approximately twenty feet from their car to a point alongside a green Chevrolet parked nearby in the lot. Freels, who was approximately ten to fifteen feet away from the green Chevrolet, ordered Davis and Fontenot, who were facing parallel to the green car, to put their hands up and then, according to Fontenot, he and Davis were told: "Walk over to the car [the green Chevrolet] and put them [their hands] on the car." (This necessitated turning to their right.) Freels testified that Fontenot stopped, turned, and put his hands on the car, while Davis "stopped and looked at me and then he started turning . . . towards the car." Freels' testimony continued:

Q. As he started to turn, did you have either of his hands in view?

A. Before he started to turn, I had both his hands in view.

[*] The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

[1] 42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[2] We take judicial notice that sunrise was at 6:15 A.M. on that date in Chicago. Chicago Tribune, March 8, 1976, § 1, at 23. Appellant's brief asserts that "it was broad daylight" and "visibility was excellent." Appellee refers to "the nighttime" in his brief and indicated that it was "morning" in his testimony.

[3] It later developed that the men in the Camaro had no connection with a shooting incident but that there had been an aggravated battery with a deadly weapon for which Fontenot was subsequently found guilty.

Q. As he started to turn . . . did you have either of his hands in view?

A. Yes, sir.

Q. Which hand?

A. His left hand.

Q. Did you have his right hand in view?

A. No, sir.

Q. All right, you told us he started to turn, and then what happened?

A. As he was turning, I saw a sudden motion with his right elbow in a backward direction.

. . .

Q. What did you do when you saw this sudden motion backward of his right elbow?

A. I fired my revolver.

Q. Then what happened?

A. . . . I shot Mr. Davis [in the back].

. . .

Q. What happened after that?

A. I walked up to them. I searched Mr. Davis for a weapon; I found none. I stepped over and searched Mr. Fontenot for a weapon; I found none on him. Then I handcuffed Mr. Fontenot.

Later, over objection, Freels was asked: "Why did you fire your weapon on this morning at Wallace Davis?" He answered: "I believed he was going for a gun." He also testified that he "consider[ed] everybody armed, unless proven otherwise"; that Davis was "12 to 15 feet away" when he shot him; and that in his judgment there was no time to fire a warning shot.[4]

Freels further testified as follows:

Q. Now, at the time that you saw the elbow—right elbow move back suddenly, was his body in the turn or in the motion?

A. Yes, sir.

Q. And as Fontenot stood, where were his hands?

A. They were on the car, sir.

Q. On the roof of the car?

A. Yes, sir.

Q. And did Wallace [Davis] at any time put either hand on the roof of the car?

A. No, sir.[5]

. . .

Q. The purpose of ordering the two men to put their hands on top of the adjacent car was what?

A. To search them for a weapon, sir.

Q. And is that a standard procedure in dealing with suspects that might be armed?

A. Yes, sir.

The testimony of Daube, a police officer for fifteen years, included the following:

Q. When Wallace Davis moved approximately what angle was he when he was shot?

A. Forty-five degrees off the car.

Q. Did you see Wallace Davis' right elbow move immediately before he was shot?

A. Yes, sir.

Q. Did he move backwards?

A. Yes, sir.

In a deposition taken some three weeks earlier, Daube testified as follows:

Q At the point Wallace Davis was shot, were you afraid of being shot?

A Not really. Probably.

## OPINION

█ Appellant Davis argues that, as a matter of law, there was no imminent danger, real or apparent, of death or great bodily harm to appellee Freels viewed from the surrounding circumstances, and the shooting of Davis was an unreasonable and excessive use of force. He cites *Clark v. Ziedonis*, 513 F.2d 79, 81 (7th Cir. 1975), for the following statement of the law:

his testimony, saying: "He [Davis] was putting his hands on there [the car], too." Davis also testified that "my back" was facing the police when he had his hands on the car.

---

4. Daube also testified that there was not enough time to fire a warning shot.

5. Both Fontenot and Davis testified that Davis did put his hands on the car before he was shot; on cross-examination Fontenot modified

The law has traditionally recognized that a person may employ deadly force against another, if such person reasonably believes such force necessary to protect a third person or oneself from imminent death or great bodily harm, without incurring civil liability for injury to the other.

He also cites *Kerr v. City of Chicago*, 424 F.2d 1134, 1141 (7th Cir. 1970), for the proposition that in determining whether the defendant—

used more force on the plaintiff than would have appeared to a reasonable person, in like circumstances, to be necessary, in order to accomplish the lawful purposes intended . . . all the circumstances [must be considered] and the standard to be applied is that of the conduct of an ordinary prudent person under existing circumstances.

Citing 4 Am.Jur. *Assault and Battery* § 11 at 133 (1936), Davis contends—

even if Appellee knew there was danger, i. e., had he actually seen an object that was apparently a gun, danger of death still would not be present until Davis clearly and plainly assaulted him.

However, this is not the law—at least in this circuit, and we believe the following statement from 6 Am.Jur.2d *Assault and Battery* § 161 at 135 (1963), not only more accurately states the law but is clearly consistent with the statements quoted from *Clark v. Ziedonis* and *Kerr v. City of Chicago,* both *supra* :

In a civil action for assault, the defendant's belief that the plaintiff intended to do him bodily harm cannot support a plea of self-defense unless it was such a belief as a reasonable person of average prudence would have entertained under similar circumstances. It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense

at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances. In other words, it is sufficient that the danger was reasonably apparent. [Footnotes omitted.]

Although the record reveals considerable conflicting testimony,[6] it contains sufficient evidence to support the jury's finding in favor of the defendant. Accordingly, we hold that the trial court did not err in denying Davis' motion for a judgment notwithstanding the verdict.

Appellant argues that the trial court erred in numerous evidentiary rulings which, considered singularly or cumulatively, constituted reversible error. Two of the complained of rulings were (1) admission of testimony that Freels had never previously fired his gun in the direction of a human being, and (2) admission of testimony from Officer Daube and Officer Foster, a black, that Freels always treated black people with equal respect. However, Freels points out that during his examination at the trial, Davis' counsel injected bigotry into the case by accusing Freels of shooting Davis because he was black. Freels argues that he was entitled to refute such a "damaging" and "highly prejudicial" charge, and "to fight fire with fire." *United States v. Bessesen*, 445 F.2d 463, 470 (7th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368 (1971). *See also United States v. Regents of New Mexico School of Mines*, 185 F.2d 389, 391 (10th Cir. 1950). We are satisfied that the trial court did not err in these two rulings.

On direct examination, appellant testified that he owned two auto repair shops and Wallaces Rib Shop and that he was going to one of the auto repair shops at

---

**6.** The trial court, in its opinion, stated:

Defense counsel did demonstrate that various of plaintiff's witnesses had made statements prior to trial that were inconsistent with their testimony at trial. In fact, the impeachment evidence against one of plaintiff's witnesses, Elijah West, was such that the Court directed the United States Attorney to examine his testimony for possibly laying the matter before the Grand Jury as being perjury.

the time he was shot by Freels. On cross-examination he was asked whether he had filed income tax returns for 1973, 1974, and 1975. Appellant's objection was overruled, and he contends that this was error. Appellee argues that the questioning about income tax returns was for the purpose of casting doubt on appellant's credibility regarding his ownership of the three businesses, and that failure to report any income from those businesses would be inconsistent with such claimed ownership. This theory of admissibility was not the one relied on at trial, where defendant's counsel justified the question as going to the plaintiff's general credibility as a witness. We offer the following observations because, as concluded *infra*, the case must be retried. Whether appellant owned the three businesses was an issue injected into the case by appellant himself in an effort, apparently, to bolster his own credibility and to blunt the possible inference that he lacked any good reason to be where he was at the place and time of the incident. The issue being collateral, 3A *J. Wigmore Evidence* § 1003 (Chadbourne ed. 1970), it cannot be the subject of independent evidence, *id.*, § 1001. The question and answer are all the jury will hear. For this reason, the trial judge, in exercising his discretion to allow cross-examination bearing on such an issue, ought to satisfy himself that there is a basis in fact for the ultimate inference the cross-examiner would have the trier of fact draw, in this case that appellant did not own the businesses. At the new trial, which we conclude *infra* must be granted, the judge will be guided by what we have said.

■ Appellant argues that the trial court erred in allowing Freels' counsel to introduce portions of appellant's original complaint, particularly the claim that appellant was robbed by Freels and Daube, "even though that claim was not a part of the Amended Complaint, which was the basis for the trial." Appellant makes the same argument regarding the trial court's permitting, over objection, Freels to read from Davis' deposition, which "involved exclusively events occurring after the . . . shooting," including the claim that he was robbed by Freels and Daube. However, for the purpose of impeaching Davis' credibility, Freels could properly rely on material admissions by Davis in his original complaint. *Nisbet v. Van Tuyl*, 224 F.2d 66 (7th Cir. 1955). And Rule 32(a)(1), Fed.R. Civ.P., provides that "any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness." [7]

■ Appellant argues that the trial court erred in refusing to permit his attorney to impeach Officer Ronald Opasinski with a prior written statement or testimony on deposition relating to that statement or to examine him as an adverse witness. (This officer arrived at the scene of the shooting immediately after it occurred.) Opasinski was called as a witness by appellant and testified that Freels did not make a statement to him that Davis was shot because he ran away. Appellant's counsel then sought to ask Opasinski about a written statement he had made earlier in which (as brought out in counsel's offer of proof) he had said that Freels told him that the two men had started to run. The court sustained Freels' counsel's objection to the question on the ground that there was no foundation for asking Opasinski an impeaching question.[8]

7. One member of the panel believes that the trial court erred in permitting defendant to introduce (1) allegations from the original complaint that plaintiff was robbed by defendants Freels and Daube, and (2) parts of plaintiff's pretrial deposition to the same effect. It is his position that these were immaterial matters not alluded to in plaintiff's direct testimony and were, therefore, neither a proper subject for cross-examination nor relevant evidence of the witness' lack of credibility; furthermore that, as the district court bifurcated the trial, this evidence would be admissible only in the second trial on damages.

8. The court also pointed out that there had been no indication by appellant's counsel that Opasinski had been called as an adverse witness and no showing that he was adverse. Any harm that was done by refusing to allow examination of the witness as adverse seems to have been subsumed in the refusal to allow impeachment, but in any event the necessity for a retrial makes it unnecessary to rule on plaintiff's assertion that this ruling was error.

Appellee argues that Rule 801(d)(1), Fed.R. Evid., would prohibit the prior written statement from being used as evidence except for impeachment of Opasinski; that impeaching Opasinski could only have affected his credibility; and that he was called by appellant's counsel "for the sole purpose of using his alleged prior statement as a hearsay attack on Freels' credibility." On the basis of the present record, which does not include a deposition of Opasinski that is referred to in plaintiff's brief on appeal, we cannot say that error was committed. If, however, it is shown at the retrial that Opaskinski previously testified in his deposition that Freels had stated in substance that Davis was shot because he ran away, then Opasinski's testimony would seem to meet the test of Fed.R.Evid. 801(d)(1)(A) and would be admissible as substantive evidence that Freels made the statement.

■ Appellant argues that the closing argument of Freels' counsel was so prejudicial as to constitute reversible error and that he made statements directed at evidence and issues immaterial to the case. On retrial this issue may not arise, so we merely point out that "fair comment to the jury" is a broad principle when confined to the evidence or the reasonable inferences to be drawn therefrom. *Chapman v. Alton Railroad Co.*, 117 F.2d 669, 672 (7th Cir. 1941). However, there are limitations. *See London Guarantee & Accident Co. v. Woelfle*, 83 F.2d 325 (8th Cir. 1936).

■ Appellant further argues that the trial court abused its discretion in ordering a bifurcation of the trial pursuant to appellee's motion since "the issues of damages, punitive damages and liability overlap." Whether to separate the issues of liability and damages in a civil case is reserved to the discretion of the trial court. Fed.R. Civ.P. 42(b); *In re Master Key Antitrust Litigation*, 528 F.2d 5, 14 (2d Cir. 1975). We leave it to the trial judge assigned to retry the case to decide whether bifurcation is appropriate under the circumstances.

■ Finally, appellant contends that the trial court erred in barring the testimony of James Dahn, an expert in the field of ballistics, offered to impeach the testimony of Freels and Daube. This issue can best be understood by reference to the record:

Q Mr. Dahn, will you assume these facts, and I am going to recite a rather long series of facts. At the conclusion of this question I am going to ask you if you understand the question and then if you can answer it, all right?

A Okay.

Q Mr. Dahn, would you assume this: Would you assume for purposes of this question that we had an east and a west alley. At the top of a chart that would be west and at the bottom it would be east. The alley is adjacent to an empty lot. The empty lot is large, sufficiently large as to not involve us.

Would you assume that a police officer is standing with his 357 magnum pistol, which carries in its barrel a 357 round, and that he is standing five feet north of the alley and ten feet west of the beginning of that lot.

Would you assume that he stays there and, in fact, shoots his weapon from that spot.

Would you assume further that there is a car, which we are calling car X, that is on a north-south direction to the alley, that is, it is facing the alley, and the front of the car faces the north. Would you assume that the front of that car X is ten feet off of the alley, from 10 to 15 feet off of the alley. Would you assume that this car is 10 feet west of the police officer.

Would you assume that the man shot was approximately even with the driver's door of car X and approximately two feet east of the door. Would you assume that the man was shot by the police officer, again approximately 12 to 15 feet from the man shot—they were 12 to 15 feet apart in other words.

Would you assume that the bullet entered that man's body at the tenth intercostal space in the posterior aspect, that is the back, the upper left back. Would you assume that it lodged and several months later was surgically removed from the right lower part of his abdomen, specifically at the sixth intercostal space.

Would you assume that the pathway of the bullet as described by the surgeon and doctor familiar with this area . . was a plane parallel to the ground without deflections upon entry.

Now, assuming all of those facts, Mr. Dahn, could you tell me to a reasonable degree of engineering certainty the angle that the man shot would bear to car X? Can you tell me that?

MR. FITZPATRICK: Your Honor, I would interpose this objection. I think on the facts related one is mistaken. It has the front of car X headed north. I think it is an agreement that it was headed south.

MR. HEGARTY: You are correct, counsel. It is south.

MR. FITZPATRICK: I would say on those facts that that is a question that requires no expert, that this is a question within the province and the abilities of the jury. An expert witness is only to be brought in where there is something that requires study and learning that the ordinary man would not have in his experience.

Now, the question also omits the fact that the person shot was in a rotary motion, that he was turning at the time. Now, all of these assumptions of distance and that I would say if an ordinary man had it and if he plotted it out on a piece of paper and then drew the car and the two men the ordinary man would be able to answer that question as well as any expert who has studied ballistics.

This is not a case that involves deflection or ricocheting or anything like that. So that is the basis for my objection of submitting this question to the expert.

THE COURT: You may reply to the objection.

MR. HEGARTY: Thank you, your Honor.

Unless the ordinary man has been trained in external ballistics, he would have no way of determining the angle that man would face to the car. As a matter of fact, when I asked Dr. Lowe if the bullet was deflected, counsel stood up and wondered and queried whether it was deflected.

The officers have testified that the man was 45° and he was on some angle to them. I believe the testimony shown by the plaintiff will reflect he was completely turned away from them.

I am offering this evidence to show that as a matter of geometric law he could not be standing at a 45° angle as a matter of geometric law.

.   .   .

MR. FITZPATRICK: Your Honor, if it is a matter of geometry, and I think that is all it is, the degree of angle, I would think that a jury is qualified to know whether it is 45° or 90° or 30°. And I don't think it is a matter that an expert can top a jury on, because it is just a matter of experience and position. And counsel says here he is—so that is my position, your Honor.

THE COURT: I do not believe that the information which you seem to be seeking, Mr. Hegarty, is information that must be given by an expert witness. You are asking for purely factual information. I, therefore, sustain the objection to the question.

MR. HEGARTY: I, at this time, would like to make an offer of proof, your Honor.

THE COURT: You may make an offer of proof.

Ladies and gentlemen of the jury, I will excuse you for a brief period.

.   .   .

Q What would an ordinary person have to know and what education would he have to have to make a calculation as to the angle this person shot bore to the car?

A He would need to know the—one is the response time of the individual who is

shot, how fast he could move versus time that the trigger was pulled by the policeman, that is an integral factor that must be considered.

You must consider the degree of deflection that the bullet could have or the dispersion that a bullet could have from a pistol fired from a policeman. He would need to know how a bullet would enter into a material like a human body in order to be able to determine what angle the human would have been at relative to the line of sight of the policeman.

Q Would this hypothetical person need to know anything about the velocity of particular weapons?

A He would need to know the velocity of the particular weapons in order to determine the response time between the time the trigger was pulled until the bullet hit the person, how much movement could the person have in that particular time period.

.　.　.

Q Mr. Dahn, can you answer my original hypothetical question?

A Yes.

Q Would you do so?

A Yes. The angle in which the person was at at the time he was shot, including the response times out of the police officer and the response times of the bullet would be no greater than 20° relative to the westerly direction.

Q Could it be less than that?

A It could be less than that, yes, depending—I had, in my calculation, based the automobile 10 feet from the alley. If the automobile was greater than 10 feet from the alley, this angle would be smaller.

Q And if the feet given to you were greater than 10 feet, for example, 10 to 15 feet, then the angle would be less than 20°, would it not?

A It would be very close to zero degrees actually.

Q Taking into account the facts I have given you, is it possible for a man to be facing 45° and be shot at the point I have indicated by a man who was shooting a gun at the point I have indicated that the policeman was standing?

A It is not possible.

Q Is it not possible, sir, as a geometric law or in a matter—to a matter—to a reasonable degree of engineering certainty?

A Yes, that is right.

MR. HEGARTY: Your Honor, thank you. That completes my offer of proof.

.　.　.

THE COURT: I deal only with the hypothetical question asked and the objection made to the hypothetical—or the offer of proof rather. I deal only with the offer of proof made by the question and answer method, which is one of two methods that the law permits an offer of proof to be made. I sustain the objection to what has been described by counsel for the plaintiff to be an offer of proof.

Appellee properly states that "[t]he question with which the trial court was faced was whether the jury was competent to draw its own conclusion from the physical facts unaided by expert opinion." However, we cannot agree with appellee's argument that this was a matter "calling for application of simple geometry to the facts, a task clearly within the ken of the average juror." Speed of the bullet and the degree of tolerance for any body movement are involved. Clearly the "scientific, technical, or other specialized knowledge" possessed by the witness Dahn would "assist the trier of fact to understand the evidence or to determine a fact in issue," and, therefore, Dahn should have been permitted to testify "in the form of an opinion or otherwise" in response to the hypothetical question. Fed. R.Evid. 702. We regard this aspect of the case as crucial to a determination of whether both of appellant's hands were on the car at the time he was shot and/or whether appellant "was completely turned away" from the police officers. Such a determination would have a bearing on the credibility of testimony on both sides and would be one of the circumstances to be considered in making a finding with respect to the reasonableness of Freels' conduct. Although

great deference must be accorded the jury in its findings, those findings can be deficient if highly relevant evidence is excluded from the jury's consideration. Accordingly, we conclude that the trial court's barring of Dahn's testimony was manifestly erroneous. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *United States v. Garvin*, 565 F.2d 519, 522 (8th Cir. 1977).

In view of all the foregoing, we hold that the motion for a new trial should have been granted.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.