**COMPUTER SYSTEMS ENGINEERING, INC., Plaintiff, Appellee,**

**v.**

**QANTEL CORPORATION, Defendant, Appellant.**

**COMPUTER SYSTEMS ENGINEERING, INC., Plaintiff, Appellant,**

**v.**

**QANTEL CORPORATION, Defendant, Appellee.**

Nos. 83–1747, 83–1748.

United States Court of Appeals, First Circuit.

Argued Feb. 9, 1984.

Decided July 11, 1984.

Rehearing Denied Aug. 24, 1984. Rehearing and Rehearing En Banc Denied Sept. 11, 1984.

Thomas K. Christo, North Hampton, N.H., with whom Robert G. Watson, North Hampton, N.H., was on brief, for Computer Systems Engineering, Inc.

Jack E. Brown, Phoenix, Ariz., with whom Eugene D. Cohen, Lawrence G.D. Scarborough, Bonnie P. Tucker, John W. Rogers, Victoria S. Lewis, Jessie T. Martori, Brown & Bain, P.A., Phoenix, Ariz., Jeffrey Swope, John T. Harding, Jr., Palmer & Dodge, Boston, Mass., Patricia A. Durham, Justin T. Beck, and H. Les Holt, Hayward, Cal., were on brief, for Qantel Corporation.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,* Senior District Judge.

GIGNOUX, Senior District Judge.

In this diversity action, before us on appeal from the United States District Court for the District of Massachusetts, Computer Systems Engineering, Inc. (CSE), a Massachusetts corporation, brought suit against Qantel Corporation (Qantel), a California corporation, for breach of contract, fraud, and unfair or deceptive acts and practices as defined in Mass.Gen.L.Ann. ch. 93A, § 2 (West 1984), and for multiple damages and attorney's fees as provided by *id.* § 11.[1] The chapter 93A claim was tried before the court (Keeton, J.), simultaneously with a jury trial of the breach of contract and fraud claims. In response to special interrogatories, the jury found that (1) Qantel breached its distributorship contract with CSE; (2) Qantel's fraudulent representations induced CSE to enter into the original distributorship contract of April 16, 1976, or a subsequent extension thereof by a letter agreement dated August 1, 1977; (3) CSE sustained the same compensatory damages under each theory of liability in the amount of $2,336,742 ($1,129,842 actual losses and $1,206,900 lost profits); and (4) punitive damages of $15,000,000 should be awarded against Qantel for fraud.[2]

After the jury returned its verdict, Judge Keeton decided the choice-of-law issues upon which he had reserved ruling prior to submitting the case to the jury. After further briefing and oral argument, he filed a comprehensive opinion, in which he concluded that Massachusetts, and not California, law governed both the fraud claim for punitive damages and the chapter 93A claim; he therefore set aside the jury's punitive damage award because punitive damages could not be recovered for common-law fraud under Massachusetts law. *See Computer Systems Engineering, Inc. v. Qantel Corporation,* 571 F.Supp. 1365, 1367–71 (D.Mass.1983). Judge Keeton then proceeded to determine the chapter 93A claim. He ruled, both viewing the evidence entirely independently of the jury's finding and accepting the jury's verdict as advisory, that Qantel had made false material representations to CSE with reckless disregard for their truth or falsity; that CSE reasonably relied upon these representations; that Qantel's conduct constituted a violation of chapter 93A, § 2; that Qantel was entitled to recover under chapter 93A; that CSE had sustained compensatory damages of $2,336,742, the same amount as awarded by the jury; and that the chapter 93A violation was "willful or knowing," entitling CSE to double damages under chapter 93A, § 11. *Id.* at 1371–78. After further briefing and oral argument, Judge Keeton entered a second memorandum and order, making additional findings of fact to support his award of double damages to CSE on its chapter 93A claim,

* Of the District of Maine, sitting by designation.

**1.** CSE's complaint contained other claims as well. CSE withdrew the other claims before the case was submitted to the jury.

**2.** In response to additional interrogatories, the jury also found against Qantel on its counterclaim for payment for goods delivered. The district court subsequently granted Qantel's motion for judgment n.o.v. and awarded $35,153.30 on the counterclaim. CSE has not appealed this ruling.

denying Qantel's motion for judgment n.o.v. or for a new trial; awarding CSE $267,025 attorney's fees on the chapter 93A claim; and denying CSE's claim for pre-verdict interest. *See Computer Systems Engineering, Inc. v. Qantel Corporation,* 571 F.Supp. 1379 (D.Mass.1983) (partial publication). In accordance with these rulings, judgment was entered for CSE in the total sum of $4,997,544.50.

Presently before us are Qantel's appeal and CSE's cross-appeal. After reviewing the record, we find no error and affirm the judgment of the district court.

### Factual Background

Qantel is a manufacturer of small business computers. On April 16, 1976, Qantel and CSE entered into a written distributorship agreement granting CSE an exclusive territory in the Boston area for the sale of computer systems manufactured by Qantel. That agreement was extended by a letter agreement dated August 1, 1977, executed by Qantel on November 18, 1977. In August 1978, Qantel terminated CSE's distributorship because of CSE's failure to sell its quota of computers in accordance with the agreement. CSE then brought this suit.

The controversy in this case centers around a computer software package[3] called SOLUTIONS. In order for a computer to be useful to an end user, sufficient software must be provided. CSE alleged that under the distributorship agreement it was to be a distributor of Qantel computer systems, and that SOLUTIONS was to be the software portion of the package Qantel was to furnish for sale by CSE. More particularly, CSE claimed that Qantel had obligated itself to and represented that it would provide a "turnkey"[4] software package called SOLUTIONS for CSE to sell with the hardware. Qantel strenuously denied assuming any such obligation or making such a representation. It asserts that its only obligation was to furnish the hardware.

Both the judge and jury found, and Qantel does not now dispute, that the SOLUTIONS software made available to CSE during the relevant period was not sophisticated enough to be sold to end users without substantial modifications. The judge and jury also found, and the evidence supports the finding, that representatives of Qantel repeatedly assured CSE during the relevant period that Qantel would provide turnkey software, that SOLUTIONS had only a few bugs in it, and that a turnkey version would be available very shortly. The evidence also supports the further finding of the judge and jury that Qantel was aware at all relevant times that in actuality SOLUTIONS would require very substantial modifications before it could be called turnkey.[5]

### I. QANTEL'S APPEAL

Qantel's appeal presents the following questions for our consideration: the sufficiency of the evidence to support the findings for CSE on the breach of contract, fraud, and chapter 93A claims; the sufficiency of the evidence to support the award of compensatory damages to CSE; the meaning of the phrase "willful or knowing" as used in Mass.Gen.L.Ann. ch. 93A § 11; the district court's alleged abuse of discretion in denying Qantel's motion for a new trial based on (1) the submission of the punitive damages issue to the jury, (2) the improper closing argument of CSE's counsel, and (3) the allegedly false testimony of CSE's president.

---

**3.** The computer itself is the "hardware"; the programming necessary to run it is the "software"; together the hardware and software form the "computer system."

**4.** Software packages generally require some modification for a particular user. A "turnkey" software system is one that is easily adapted for various uses, requiring a minimum amount of reprogramming to be modified for a particular user. It can be used almost straight "off the shelf."

**5.** Between 1976 and 1980, when a turnkey version of SOLUTIONS was finally perfected, the number of programs in SOLUTIONS was increased from 208 to 438, and about 75,000 lines of code were added.

A. *The Sufficiency of the Evidence on the Breach of Contract, Fraud, and Chapter 93A Claims*

In paragraph 3(f) of the 1976 distributorship agreement, Qantel agreed to "[p]rovide marketing direction and guidance as required." The thrust of CSE's breach of contract claim was that Qantel failed to provide "marketing direction and guidance" as required by paragraph 3(f). CSE's position is that this provision required Qantel to furnish CSE with a software package that was turnkey. CSE supported its interpretation of paragraph 3(f) by parol evidence, which included testimony regarding representations made by Qantel during the negotiation of the distributorship agreement that it would provide turnkey software; evidence that Qantel furnished to CSE for delivery to end users brochures describing SOLUTIONS as turnkey; evidence that, after execution of the agreement, Qantel assured CSE that SOLUTIONS would "soon be fixed"; and evidence that Qantel had placed responsibility for the development of SOLUTIONS in its marketing department. Qantel argues that parol evidence on the interpretation of paragraph 3(f) was improperly admitted. It contends that its distributorship contract with CSE was a fully integrated agreement that expressly excluded any responsibility for providing a software package and that it should have been so interpreted by the court as a matter of law rather than being submitted to the jury. Further, Qantel argues that if the contract expressly precluded any responsibility of Qantel to provide software, the fraud and chapter 93A claims must also fall, since CSE would be unable to establish justifiable reliance on representations which contradicted the written terms of the distributorship agreement. *See Nei v. Burley*, 388 Mass. 307, 311, 446 N.E.2d 674, 677 (1983); *Brockton Olympia Realty Co. v. Lee*, 266 Mass. 550, 557–58, 165 N.E. 873, 876 (1929).[6]

Qantel neglected to make these arguments below. In fact, Qantel requested the court to instruct the jury that it was for them to interpret disputed contract language and that in interpreting such language, "the intent of the parties may be determined by their acts and express understandings, particularly where they have acted under the contract for a period of time." It is true that because the parol evidence rule is a rule of substantive law, *see* Cal.Civ.Code Proc. § 1856(a) (West 1983); *Tahoe National Bank v. Phillips*, 4 Cal.3d 11, 22–24, 480 P.2d 320, 328–30, 92 Cal.Rptr. 704, 713–14 (1971),[7] Qantel was not required to "pepper the record with objections" whenever such evidence was introduced in order to preserve the issue for appeal. *See Chelsea Industries, Inc. v. Accuray Leasing Corp.*, 699 F.2d 58, 62 (1st Cir.1983). Qantel was required, however, to make known to the trial court its positions concerning the parol evidence rule and the court's obligation to interpret the contract as a matter of law. We have repeatedly held that we will not consider a legal contention not presented to the trial court and raised for the first time on appeal. *E.g., Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 73 (1st Cir.1984) (listing cases); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979). Moreover, Qantel was required, at the very least, not to "invite error" by requesting jury instructions based on a statement of law it would subsequently seek to make a basis for reversal on appeal. *McPhail v. Municipality of Culebra*, 598 F.2d 603, 607 (1st Cir.1979); *see Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 15 (1st Cir.), *cert. dismissed,* — U.S. —, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983); *Gundy v. United States*, 728 F.2d 484, 488 (10th Cir.1984); *Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 772 (3d Cir.1975). Although in exceptional cases we have entertained new arguments on appeal, *see Austin v.*

---

**6.** The district court ruled, and we agree, *see post* at IIA, that Massachusetts law governs the fraud claims.

**7.** The distributorship agreement provided that it was to be "governed" by California law, and the parties agree to the application of California law to the breach of contract claim.

*Unarco Industries, Inc.,* 705 F.2d at 15; *Robinson v. Watts Detective Agency,* 685 F.2d 729, 737 n. 10 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 1191, 74 L.Ed.2d 953 (1983), we have done so only "in horrendous cases where a gross miscarriage of justice would occur" and where the new argument is "so compelling as virtually to insure appellant's success." *Johnston v. Holiday Inns,* 595 F.2d at 894 (citations omitted). This is not such a case. We do not find that our failure to consider Qantel's new arguments would result in a "gross miscarriage of justice," nor are they "so compelling as virtually to insure [Qantel's] success." [8]

A final question remains. Qantel contends that CSE could not justifiably rely on the alleged misrepresentations concerning SOLUTIONS and waived any right to recover for fraud by renewing the distributorship agreement in November 1977 with full knowledge of any misrepresentations. *See Powers v. Rittenberg,* 270 Mass. 221, 226, 169 N.E. 913, 915 (1930); *Restatement (Second) of Torts* § 541; *see also Deutsch v. Health Insurance Plan of Greater New York,* 573 F.Supp. 1433, 1441 (S.D.N.Y. 1983).

■■■■ Qantel did make this argument below. The district court, sitting as factfinder on the chapter 93A claim, expressly found that Qantel did not prove that CSE knew, or reasonably should have known, on or before the 1977 extension of the distributorship agreement, that Qantel's representa-

tations were fraudulent. The same finding was implicit in the jury's verdict on CSE's fraud claim. We may not set aside the district court's explicit finding on this issue in the context of the chapter 93A claim unless it is "clearly erroneous." Fed.R. Civ.P. 52(a); *United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *SEC v. MacDonald,* 725 F.2d 9, 11 (1st Cir.1984); *Marshall v. Commonwealth Aquarium,* 611 F.2d 1, 2 (1st Cir.1979). Similarly, the standard for our review of the jury's verdict on the fraud claim is well settled. We must "review the evidence and the inferences to be drawn therefrom in the light most favorable to appellee," and will vacate the verdict "only upon a determination that the evidence could lead reasonable men to but one conclusion, a determination made without evaluating the credibility of witnesses or the weight of the evidence at trial." *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 199–200 (1st Cir.1980); *see also Coleman v. DeMinico,* 730 F.2d 42, 47 (1st Cir.1984). The finding of the judge and jury that CSE justifiably relied on Qantel's fraudulent misrepresentations at the time of the 1977 renewal of the distributorship agreement passes muster under both of these standards.

The record is clear that between April 16, 1976, the date of the original distributorship agreement, and November 18, 1977, the date of execution of the subsequent letter agreement, Qantel repeatedly assured CSE that the few "bugs" in SOLU-

---

**8.** The distributorship agreement incorporated by reference a Schedule B, the standard agreement for the purchase of Qantel computers. Schedule B in turn incorporated by reference a Schedule I, which disclaims any obligation by Qantel to supply software other than a package known as BEST. Qantel's position is that this disclaimer precluded the presentation of parol evidence to establish that paragraph 3(f) of the distributorship agreement obligated Qantel to provide turnkey software. California's parol evidence rule bars extrinsic evidence only of terms inconsistent with the written provisions of the contract. *Tahoe National Bank v. Phillips,* 4 Cal.3d at 22–24, 480 P.2d at 328–30, 92 Cal.Rptr. at 713–14. Schedule I, by its terms, provides only that the equipment described in the purchase agreement does not include soft-

ware other than BEST. It does not purport to govern the distributorship relationship. We perceive no inconsistency between the disclaimer and the extrinsic evidence supporting CSE's interpretation of the contract.

Nor was it error for the court to submit the interpretation of paragraph 3(f) of the distributorship agreement to the jury. Where, as in this case, the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, that interpretation is to be made by the trier of fact. *United Truck & Bus Service Co. v. Piggot,* 543 F.2d 949, 950 n. 1 (1st Cir.1976); *Restatement (Second) of Contracts* § 212(2) (1981); *see also* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2588 at 750–52 & nn. 47 & 48 (1971).

TIONS would soon be "fixed" and that a turnkey system as described in the Qantel brochures was "just around the corner." Although there was some evidence that during this period CSE was aware of problems with SOLUTIONS,[9] our review of the record convinces us that there was more than sufficient evidence to support the finding of the judge and jury that CSE neither knew, nor reasonably should have known, prior to the renewal of the distributorship agreement in November 1977, that Qantel's representations as to the state of development of SOLUTIONS were fraudulent.

B. *The Sufficiency of the Evidence of Compensatory Damages*

The jury awarded the same compensatory damages on both the breach of contract and the fraud claims: $1,129,842 for actual out-of-pocket losses and $1,206,900 for lost profits, for a total of $2,336,742. The judge awarded the same compensatory damages on the chapter 93A claim. Qantel claims that the evidence on damages was insufficient as a matter of law to support the award of $1,206,900 damages for lost profits.

The amount the jury awarded for lost profits was one of three precise figures testified to by CSE's expert witness on damages, Bernard Kavanagh, a certified public accountant and CSE's auditor since 1975. Of the two other figures to which Kavanagh testified, one was higher and one was lower than the figure the jury and judge chose. Kavanagh's calculations were based upon three different profit and loss forecasts produced in evidence by CSE. From each of these forecasts he extrapolated CSE's projected profits over the five-year term of the extended contract.

■ Qantel's first objection to the damage award for lost profits is that the forecast upon which it was apparently based, Exhibit 66, was inadmissible hearsay. Exhibit 66 was a one-page document that was

purportedly a projected profit-and-loss statement for the second year of operations of a Qantel distributor. CSE's president, Norman Mackinnon, testified that it was the second page of a two-page profit-and-loss statement, of which the first page was missing, and that it was given to him in March 1976 by a Qantel vice president, Terry Marsh. Mackinnon testified that Marsh represented to him that the statement detailed the expected performance of a Qantel distributor under the agreement being negotiated with CSE. We agree with Judge Keeton that Exhibit 66 was clearly admissible based on Mackinnon's testimony, as an admission by a party opponent. Fed.R.Evid. 801(d)(2)(B); *see United States v. 320.0 Acres of Land,* 605 F.2d 762, 825 (5th Cir.1979); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 802(d)(2)(B)[01] at 801–143—801–144 (1981); 4 D. Louisell & C. Mueller, *Federal Evidence* § 424 at 281–84 (1980); *see also* Fed.R.Evid. 801(d)(2)(C).

■ Qantel next argues that Kavanagh was not qualified as an expert to give an opinion as to the profits CSE would have realized had Qantel provided adequate software. Qantel's argument appears to be that, although Kavanagh was qualified as an accountant to calculate projected profits from the profit-and-loss forecasts, he was not qualified to testify that CSE would have received those profits had it been furnished the appropriate software. Under Fed.R.Evid. 702, the trial court has broad discretion in admitting expert testimony. *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *United States v. Fosher,* 590 F.2d 381, 382 (1st Cir.1979); *see* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02] at 702–12 (1982). As an experienced accountant familiar with CSE's operations, Kavanagh arguably had specialized knowledge that would assist the trier of fact to understand the evidence and determine a fact in issue, that is, what CSE's

---

**9.** The evidence discloses that CSE lost key technical personnel during the spring and early summer of 1977 and did not hire a replacement until August 1977. There is evidence that in

October 1977 this new employee was beginning to doubt the ability of Qantel to "fix" SOLUTIONS.

performance would have been with software of the caliber later made available by Qantel. *See* Fed.R.Evid. 702. We cannot say that the court below abused its discretion in admitting this testimony.

■ Finally, Qantel contends that CSE's proof of lost profits was so speculative that no award was allowable. In support of this argument, it raises various objections to the methodology used by Kavanagh in deriving his lost profit projections. These specific objections would have been better aired by Qantel through cross-examination of Kavanagh, or through testimony of an expert of its own. Qantel chose to do neither. It elected, instead, to limit its evidence to testimony by an expert to the effect that CSE's proof of lost profits was too speculative to support an award. As Judge Keeton observed, "[t]he fact finder could properly and obviously did in fact disbelieve this evidence." Qantel "cannot now complain about the jury's [and judge's] reliance on the only evidence on damages which was presented." *Jay Edwards, Inc. v. New England Toyota Distributor,* 708 F.2d 814, 822 (1st Cir.) (quoting from *Kingsport Motors, Inc. v. Chrysler Motors Corp.,* 644 F.2d 566 (6th Cir.1981)), *cert. denied,* — U.S. ——, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983).

■ Qantel argues that CSE's proof of lost profits was too speculative to support an award because CSE had no previous earnings history as a Qantel distributor. It is true that Massachusetts law does not permit an award for lost profits to be based on "conjecture, surmise, or hypothesis." *See, e.g., MacDonald v. Hawker,* 11 Mass.App. 869, ——, 1981 Mass.App.Ct. Adv.Sh. 1014, 1023, 420 N.E.2d 923 (1981). But Massachusetts law does permit proof of lost profits for a new business to be established through the testimony of experts. *Providence Granite Co. v. Joseph Rugo, Inc.,* 362 Mass. 888, 889, 291 N.E.2d 159, 160 (1972); *Rombola v. Cosindas,* 351 Mass. 382, 385, 220 N.E.2d 919, 922 (1966);

*Urico v. Parnell Oil Co.,* 708 F.2d 852, 856 (1st Cir.1983) (Massachusetts law). As we have recently observed in the context of federal law, "[d]amages for lost profits need not be proved with mathematical certainty, provided an award has a rational basis in the evidence." *Jay Edwards, Inc. v. New England Toyota Distributor,* 708 F.2d at 821. Massachusetts law is the same. *Rombola v. Cosindas,* 351 Mass. at 385, 220 N.E.2d at 922; *Urico v. Parnell Oil Co.,* 708 F.2d at 856. Moreover, "where defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision." *Jay Edwards, Inc. v. New England Toyota Distributor,* 708 F.2d at 821.

■ We have considered Qantel's contentions and are satisfied that the award of $1,206,900 damages for lost profits has adequate support in the record.

## C. *The Award of Double Damages Under Chapter 93A*

■ Section 11 of chapter 93A provides for the recovery of not less than double but not more than treble the compensatory damages if the court finds that "the act or practice was a willful or knowing violation of said section two." Judge Keeton interpreted the phrase "willful or knowing violation" to include a misrepresentation made with reckless disregard as to its truth or falsity, that is, with the defendant's knowledge that he did not know whether the asserted fact was true or false. *See Computer Systems Engineering, Inc. v. Qantel Corporation,* 571 F.Supp. at 1373–77. Finding that Qantel had made false representations to CSE with reckless disregard for their truth or falsity, *id.* at 1377, Judge Keeton awarded double damages on the chapter 93A claim, *id.* at 1378. Qantel argues that a misrepresentation made with reckless disregard for its truth or falsity is not sufficient to constitute a "willful or knowing violation" of chapter 93A.[10]

---

10. Qantel's challenge to Judge Keeton's award of double damages on the chapter 93A claim is limited to his interpretation of the language "willful or knowing violation" in section 11. In this appeal, Qantel does not contest Judge Keeton's finding that Qantel had made false repre-

We accept Judge Keeton's comprehensive and scholarly analysis, and affirm his interpretation of the language "willful or knowing violation" on the basis of his opinion.

### D. The Fair Trial Issues

Qantel alleges that the district court erred by failing to grant Qantel's motion for a new trial based on (1) the submission of the punitive damages issue to the jury, (2) the improper closing argument of CSE's counsel, and (3) the allegedly false testimony of CSE's president.[11]

"A motion for a new trial is directed to the sound discretion of the trial court, and will be reversed only for abuse of that discretion." *Johnson v. A/S Ivarans Rederi,* 613 F.2d 334, 351 (1st Cir.1980), *cert. dismissed,* 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981); *see also Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam); *Jay Edwards, Inc. v. New England Toyota Distributor,* 708 F.2d at 824. We cannot say that the district court abused its discretion in this case.

■ (1) *The Submission of the Punitive Damages Issue to the Jury.* Qantel contends that the district court's refusal to eliminate the punitive damages issue as a matter of law before submitting the case to the jury was highly prejudicial and required that a new trial be granted. It asserts prejudice in two respects: first, CSE was able to present to the jury punitive damage evidence, including evidence regarding the wealth of Qantel and its corporate parent; second, CSE's counsel was permitted to argue punitive damages to the jury. The punitive damages evidence and argument, Qantel argues, may have influenced the jury's findings on the questions of liability and the amount of compensatory damages. These arguments were presented to and rejected by Judge Keeton. We find that he did not abuse his discretion in

denying Qantel's motion for a new trial on this ground.

It cannot be doubted that punitive damage evidence has "a real potential for influencing the jury's determination of liability for and the amount of compensatory damages." J. Ghiardi & J. Kircher, *Punitive Damages* § 12.01 (1983); *see, e.g., Iskander v. Village of Forest Park,* 690 F.2d 126 (7th Cir.1982). In this instance, as Judge Keeton explained to the parties at trial, the question of the applicability of California's punitive damage statute involved novel and complex choice-of-law considerations, *see post* at IIA, and a separate trial on punitive damages, if required, would entail substantial duplication of the evidence on liability and actual damages. He concluded that the interests of judicial economy would be served by submitting the punitive damages issue for determination by the jury in order to avoid the possible need for a second separate trial. To minimize possible prejudice, he submitted the case to the jury on special interrogatories and specifically instructed them that they were to make separate findings as to compensatory and punitive damages. *See* Fed.R.Civ.P. 49(a). Although he might have ordered separate trials of the claims for compensatory and punitive damages, *see* Fed.R.Civ.P. 42(b); *Davis v. Freels,* 583 F.2d 337, 343 (7th Cir.1978), he chose not to do so.

■ In order to obtain a new trial because of the submission to the jury of punitive damage evidence, later determined to be irrelevant, a defendant must show a likelihood of prejudice thereby. *See Parris v. St. Johnsbury Trucking,* 395 F.2d 543, 545 (2d Cir.1968); *National Food Stores, Inc. v. Utley,* 303 F.2d 284, 286 (8th Cir. 1962); *see also Vannoy v. Chicago, Burlington & Quincy Railroad Co.,* 462 F.2d 186 (9th Cir.1972). Here, Qantel has made no such showing. There is no indication that the evidence, the court's instructions, or counsel's argument on punitive damages influenced the jury's findings on the liabili-

sentations to CSE with reckless disregard for their truth or falsity.

11. Qantel does not press in this appeal other grounds asserted before the district court in support of its motion for a new trial.

ty issues or the amount of actual damages to be awarded. The amount the jury awarded for actual damages was one of three precise figures presented by CSE; of the other two figures, one was higher and the other was lower. The jury entered separate verdicts on compensatory and punitive damages. This case is thus easily distinguishable from cases in which it was arguable from the jury's verdict that the liability or compensatory damage findings had been influenced by improperly permitted punitive damage evidence or argument. *Compare Parris v. St. Johnsbury Trucking,* 395 F.2d at 545 (new trial denied), *with Iskander v. Village of Forest Park,* 690 F.2d at 131 (new trial granted).

 A trial judge must be given wide latitude in determining the trial procedures to be followed. *See Warner v. Rossignol,* 513 F.2d 678, 684 (1st Cir.1975); *Davis v. Freels,* 583 F.2d at 343. Here, the procedure selected by Judge Keeton clearly was "conducive to expedition and economy." *See Warner v. Rossignol,* 513 F.2d at 684. Qantel has made no showing that any prejudice resulted from the procedure he employed. We find that the court did not abuse its discretion in denying Qantel's motion for a new trial on the ground that the punitive damages issue had been submitted to the jury.

 (2) *The Improper Closing Argument of CSE's Counsel.* Qantel urges as a second ground requiring a new trial the improper closing argument of CSE's counsel. There is no question but that, as the district court recognized, portions of the argument were improper and had a "significant potential for prejudice." [12] But we agree with the district court that Qantel's belated objections came too late. Although afforded an opportunity to raise objections to improper argument outside the presence of the jury, no objection was made, either at the time of the argument or at a sidebar conference immediately following the argument. If it was counsel's view that objection would be futile because no curative instruction could have adequately cured any prejudice resulting from improper argument, he should have moved for a mistrial before the case was submitted to the jury; as Judge Keeton observed, "a party may not wait and see whether the verdict is favorable before deciding to object." Qantel's failure to object to the argument at trial or to move for a mistrial bars it from urging the improper argument as grounds for a new trial after the jury had returned its verdict. *Hobart v. O'Brien,* 243 F.2d 735, 741–42 (1st Cir.1957); *see Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d at 771–72 (3d Cir.1975); *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 666–67 (5th Cir.1967); 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2809 at 62–64 (1973); *see also American Universal Insurance Co. v. Falzone,* 644 F.2d 65, 67 (1st Cir.1981).

Finally, we will not disturb the district court's conclusion that this is not such an exceptional case that a new trial is required to prevent a miscarriage of justice despite lack of objection at trial. *See* Fed.R.Civ.P. 61; *Nimrod v. Sylvester,* 369 F.2d 870, 873 (1st Cir.1966); *Rojas v. Richardson,* 713

---

**12.** CSE's counsel's "Pontius Pilate" remarks, cited by the district court, probably were the most outrageous:

> But it comes down to you. I can't do it. You can. Mr. Dignan's arguments, his jigsaw puzzle, amounts to the question, what is truth? History tells us that 2,000 years ago another man asked that question before going on to commit the most infamous murder of all time.
>
> Now, I don't want to mislead you by that into thinking that Mr. Dignan is to be likened to Pontius Pilate. He's a good man. He's doing the best job he can, but he has elected to represent a bad client. And in so doing, he

is forced to present a bad defense. I think we know what truth is, at least I hope we do. If we don't, then maybe Spengler is right and maybe there wasn't ever a Camelot.

CSE's counsel's appeals to local prejudice were also highly improper:

> The ten million is to send from Boston in Courtroom 11 one unanimous and resolute voice to Phillips and Microdata and IBM and Honeywell and NCR and Data General and Burroughs and Qantel that truth is the most important category of a trait for a citizen, for a businessman—yes, even for a computer salesman.

F.2d 116, 118 (5th Cir.1983). *Cf. Schleunes v. American Casualty Co.,* 528 F.2d 634, 638 (5th Cir.1976); *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 286 (5th Cir. 1975).

■ *(3) The Allegedly False Testimony of CSE's President.* The final ground Qantel offers for requiring a new trial, or, at least, an evidentiary hearing, is the alleged false testimony of CSE's president, Norman Mackinnon. We have reviewed the record, and agree with the district court that, "[i]n effect, Qantel's argument seizes upon small segments of testimony in a lengthy trial, urges the court to interpret them in the most sinister way possible, and then elevate them to a position of central importance to the trial." The trial judge did not abuse his discretion in refusing to grant a new trial on this ground.

## II. CSE'S CROSS–APPEAL

CSE's cross-appeal presents the following three issues: the choice of law (California or Massachusetts) to be applied to CSE's fraud and chapter 93A claims; CSE's entitlement to a contingency factor in the award of chapter 93A attorneys' fees; and CSE's entitlement to pre-verdict interest.

### A. *The Choice-of-Law Question*

■ California law permits the recovery of punitive damages in fraud cases. Cal.Civ.Code § 3294(a) (West 1983); *see, e.g., Glovatorium, Inc. v. NCR Corp.,* 684 F.2d 658, 663 (9th Cir.1982). Massachusetts law does not provide for punitive damages for common-law fraud. *See City of Lowell v. Massachusetts Bonding & Insurance Co.,* 313 Mass. 257, 299, 47 N.E.2d 265 (1943); *Caperci v. Huntoon,* 397 F.2d 799, 801 (1st Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968). After the jury returned its verdict awarding punitive damages of $15 million against Qantel for fraud, Judge Keeton filed a comprehensive opinion, in which he concluded that under Massachusetts choice-of-law rules, *see Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), Massachusetts

law governed both CSE's fraud claim and the chapter 93A claim; he, therefore, set aside the jury's punitive damages award and applied the multiple damage provision of chapter 93A. *See Computer Systems Engineering, Inc. v. Qantel Corporation,* 571 F.Supp. at 1367–70. CSE argues that California's punitive damages statute should have been applied to its fraud claim, and the jury's punitive damages award should be reinstated as part of the judgment against Qantel.

We see no need to rehearse Judge Keeton's analysis, which is cogent and complete. We, therefore, affirm his resolution of the choice-of-law question on the basis of his opinion. We add, only for emphasis, our agreement with his conclusion that, even though the Supreme Judicial Court of Massachusetts has not yet explicitly adopted the position of the *Restatement (Second) of Conflict of Laws* on tort claims, a Massachusetts court would apply a test not materially different from that of the *Restatement (Second) of Conflict of Laws* § 148 in determining the law applicable in this case. *See Pevoski v. Pevoski,* 371 Mass. 358, 359–60, 358 N.E.2d 416, 417–18 (1976); *see also Choate, Hall & Stewart v. SCA Services, Inc.,* 378 Mass. 535, 540, 392 N.E.2d 1045, 1049 (1979); *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 19 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *King v. Williams Industries* 565 F.Supp. 321, 323–24 (D.Mass.), *aff'd,* 724 F.2d 240 (1st Cir.1983); *Schulhof v. Northeast Cellulose, Inc.,* 545 F.Supp. 1200, 1203 (D.Mass.1982).

### B. *The Award of Chapter 93A Attorneys' Fees*

Section 11 of chapter 93A provides for an award of reasonable attorneys' fees. The district court awarded CSE $234,900, representing compensation for all hours claimed at hourly rates of $200 for lead counsel, $150 for associate counsel, and $40 for paralegal services, plus a multiplier of 1.25 for "exceptionally meritorious" representation. *See Computer Systems Engineering, Inc. v. Qantel Corp.,* 571 F.Supp. at 1381–82. In addition, the court awarded

CSE $32,125 for the services of predecessor counsel. *Id.* at 1382. CSE complains that in making its award, the court failed to take into account the uncertainty of payment.

■ Under Massachusetts law, the amount of attorneys' fees to be awarded a successful plaintiff under chapter 93A is to be determined by what the "services were objectively worth." *Heller v. Silverbranch Construction Co.,* 376 Mass. 621, 629, 382 N.E.2d 1065, 1071 (1978). The amount is "largely discretionary," taking into account

> the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.

*Linthicum v. Archambault,* 379 Mass. 381, 388–89, 398 N.E.2d 482, 488 (1979).

■ The district court applied the foregoing principles in making the award of attorneys' fees in this case, and CSE has cited no Massachusetts authority requiring the court to consider a contingency factor in making an award of chapter 93A attorneys' fees. Finding no abuse of discretion, we affirm the attorneys' fee award.

### C. *The Award of Pre-Judgment Interest*

■ In accordance with Mass.Acts 1982, chapter 183, the district court allowed 12% interest from the date of the verdict to the date of the judgment on the amount of compensatory damages awarded by the jury. CSE presses before us, as it did before the district court, a claim for preverdict interest from the date the complaint was filed. Judge Keeton rejected this claim, both for untimeliness and for lack of merit. Although he recognized that Massachusetts law provided for 12% interest from the date the complaint was filed to the date of the judgment, *see* Mass.Gen.L. Ann. ch. 231 § 6C (West Supp.1984), he found that the unsegregated proof of damages included interest factors, thus "almost certainly" making an allowance of pre-verdict interest "duplicative to some extent."

*See Computer Systems Engineering, Inc. v. Qantel Corp.,* 571 F.Supp. at 1382–84. We have scrutinized the record and find no error.

### III. *Conclusion*

We have considered all the parties' contentions and find them to be without merit. Accordingly, the judgment of the district court is

*Affirmed.*

Each party to bear its own costs.

BAILEY ALDRICH, Senior Circuit Judge, (Concurring).

I concur in the court's comprehensive opinion, but with two reservations that I believe I should mention. A defendant may be seriously prejudiced in the jury's eyes on the merits by evidence admissible only on the issue of punitive damages, and the corresponding arguments—a bad man, or a very rich man, etc., etc.—just as before the existence of insurance was commonly known, it was felt prejudicial to let insurance leak out, and still may be. Similarly, plaintiffs often object to trying liability first, and damages afterwards. You cannot "show" these things, and there seems a certain inconsistency in conceding there is a "likelihood" and then saying it was not shown. The likelihood is of emotional feelings that cannot normally be shown. Further, the fact that some of the evidence would be repetitious is not necessarily an answer. If the trial resumes immediately, the jury may be cursorily reminded by counsel of evidence which need not be repeated. How much extra time is involved in two trials may be very questionable. And, of course, if no liability is found, the punitive damage portion of the first trial is pure waste.

Having said this, I am a great believer in district court discretion. I would only hope that requests for bifurcated trials not be too readily rejected because we have sanctioned this denial. (I am the more ready to accept it here because fraud was involved in the main case.)

Second, in this instance likelihood of prejudice by a combined trial, rather than not

being shown, bore the most poisonous fruit. I am deeply troubled by the outrageous Pontius Pilate jury argument. There is often merit in counsels' fear that to object serves to emphasize, rather than to defuse. While I realize that courts may be thinking about their charge to the jury, and cannot be expected to sit on the edge of their chairs to police every remark, the very fact that improper argument can create this heads-I-win, tails-you-lose situation for the opponent should suggest to the court the desirability of sua sponte intervention upon hearing a serious impropriety. A judge presiding over a trial has greater duties than simply to rule on objections. I believe this plaintiff's particular argument (improper also, incidentally, because it contained counsel's personal opinion), should have struck a judge who was listening with only one ear, and should have produced an immediate offsetting criticism.

Of more specific importance, however, this was not the sort of argument, like, say, bringing in substance improperly that it might be hoped the jury would overlook. Rather, I believe counsel here could have objected at the end of the argument and sought a judicial response without fear of emphasis or backlash. I accordingly go entirely along with the court's disposition.